Case No. 23-3760
Case No. 23-3758

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

---

WILLIAM COUSER and SUMMIT CARBON SOLUTIONS, LLC,
*Plaintiff-Appellee*,
v.
STORY COUNTY, IOWA, et al,
*Defendants-Appellants*.

---

Appeals from the United States District Court
for the Southern District of Iowa
Nos. 4:22-cv-383-SMR-SBJ and 1:22-cv-0020-SMR

---

**BRIEF OF AMICI CURIAE IOWA FARMERS UNION
AND SEVEN IOWA LANDOWNERS
IN SUPPORT OF DEFENDANTS/APPELLANTS AND FOR REVERSAL**

---

Brian E. Jorde, AT0011638
Domina Law Group PC LLO
2425 South 144th Street
Omaha, Nebraska 68144
402-493-4100
*Counsel for Amici Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1, Amicus Curiae Iowa Farmers Union states that it is a non-profit corporation. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Appellate Case: 23-3760    Page: 2    Date Filed: 05/14/2024 Entry ID: 5393614

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF CONTENTS ................................................................................. iii

TABLE OF AUTHORITIES............................................................................. v

STATEMENT OF INTEREST.......................................................................... 1

SUMMARY .................................................................................................. 2

ARGUMENT ................................................................................................ 3

    I.   THE SCOPE OF PIPELINE SAFETY ACT PREEMPTION IS
    LIMITED TO THE FIELD OF PIPELINE "SAFETY STANDARDS"
    AND DOES NOT ENCOMPASS ALL MATTERS RELATED TO
    PIPELINE SAFETY ................................................................................ 3

        A.  In Its *ANR* and *Kinley* Decisions, this Court Held that Federal
        Jurisdiction Is Exclusive Within the Scope of the PSA, But It Did Not
        Determine the Precise Extent of this Scope ........................................ 5

        B.  The Plain Language of the PSA Preemption Clause and the Defined
        Terms Used Therein Craft Precise Limits ........................................... 6

        C.  Congress Intended to Extend PSA Jurisdiction to Only a Portion of
        the Field of Pipeline Safety ............................................................... 8

    II.  THE PIPELINE SAFETY ACT DOES NOT PREEMPT COUNTY
    MITIGATION OF ABANDONED HAZARDOUS LIQUID PIPELINES ......... 11

        A.  The District Court's Extension of Pipeline Safety Act Jurisdiction to
        Abandoned Pipelines Is Contrary to the Plain Language of the PSA .............. 13

        B.  The Federal Pipeline Abandonment Regulations Establish a Process
        to Determine When PSA Jurisdiction Ends and Do Not Extend Federal
        Jurisdiction into Perpetuity ............................................................... 15

        C.  Termination of PSA Jurisdiction Upon Abandonment Is Consistent
        with the Purpose of the PSA and Necessary to Determine When
        Compliance and Enforcement End ..................................................... 16

    III. COUNTY CONSIDERATION OF SAFETY WHEN ENACTING A
    SETBACK ORDINANCE IS NOT A SAFETY STANDARD........................... 17

Appellate Case: 23-3760    Page: 3    Date Filed: 05/14/2024 Entry ID: 5393614

A.  The District Court Analysis of Consideration of Safety in County Setback Enactment Is Flawed.................................................................18

B.  The Plain Language of 49 U.S.C. § 60104(e) Bars Federal Location and Routing Safety Standards.................................................................21

C.  49 C.F.R. § 195.210 Does Not Provide a Basis for Preemption .................23

D.  Consideration of Safety in Locating and Routing Hazardous Liquid Pipelines Does Not Obstruct the Purposes and Objectives of the PSA ............26

E.  Nothing in the PSA Indicates that Congress Intended to Prohibit Consideration of Safety in Location and Routing Decisions at All Levels of Government .................................................................................28

CONCLUSION .................................................................................28

iv

# TABLE OF AUTHORITIES

## Other Authorities

*Altria Group, Inc. v. Good*, 555 U.S. 70 (2008)........................................................4

*ANR Pipeline Co. v. Iowa State Commerce Com'n*, 828 F.2d 465 (8th Cir. 1987) ..............................................................................................5, 6

*Bad River Band v. Enbridge Energy Company, Inc.*, 626 F. Supp. 3d 1030 (W.D. Wisc. 2022) ..............................................................................22

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992)....................................4, 6, 8

*Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963) .....................5, 11

*Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995) .................................................4

*Hines v. Davidowitz*, 312 U.S. 52 (1941)........................................................5, 11, 14

*Keller v. City of Fremont*, 719 F.3d 931 (8th Cir. 2013) .........................................4

*Kinley Corp. v. Iowa Utilities Board*, 999 F.2d 354 (8th Cir. 1993) ....................5, 6

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) .......................................................4

*Northern Border Pipeline Co. v. Jackson County*, Minn., 512 F. Supp. 1261 (D. Minn. 1981) ..............................................................................8

*Northern States Power Co. v. State of Minn.*, 447 F.2d 1143 (8th Cir. 1971) ..........................................................................................28

*Olympic Pipe Line Co. v. City of Seattle*, No. C03-2343L, 2003 WL 27392855 (W.D. Wash. 2003)........................................................ 17, 19, 20

*Portland Pipe Line Corporation v. City of South Portland*, 288 F. Supp. 3d 321 (D. Me. 2017) ................................................................ 22, 26

*Washington Gas Light Co. v. Prince George's County Council*, 711 F.3d 412 (4th Cir. 2013)................................................................ 4, 22, 26

*Williams Pipe Line Co. v. City of Mounds View, Minn.*, 651 F. Supp. 544 (D. Minn. 1986) ..............................................................................17

*Wyeth v. Levine*, 555 U.S. 555 (2009) .................................................................3, 4

## Statutes

49 U.S.C. §60102(a)(2)(A) and (B) ......................................................................7

49 U.S.C. § 1672(a) (1990)..................................................................................5

49 U.S.C. § 2001(4) (1990) ................................................................................23

49 U.S.C. § 60101(a)(5) ................................................................... 7, 14, 15

49 U.S.C. § 60101(a)(18)................................................................... 7, 14

49 U.S.C. § 60102 .............................................................................................21

49 U.S.C. § 60102(a) .........................................................................................8

49 U.S.C. § 60102(a)(2)(B) ........................................................................ 19, 20

49 U.S.C. § 60103(a) ........................................................................................21

v

49 U.S.C. § 60104(c) ............................................................ 3, 5, 6, 17, 18, 19, 25
49 U.S.C. § 60104(e) .................................... 2, 7, 18, 20, 21, 22, 23, 24, 25, 27
49 U.S.C. § 60108(b)(6)(A) ...........................................................................14
49 U.S.C. §§ 60101-60140 ...............................................................................2
49 U.S.C. §§ 60101(a)(4) ..................................................................................8
49 U.S.C. §§ 60101(a)(5), 60101(a)(18), 60102(a)(2) ....................................2
49 U.S.C. §§ 60101(a)(5), (18), 60102(a)(2)..................................................15
49 U.S.C. §§ 60102(a)(2), 60101(a)(18) and (19) ........................ 6, 17, 18, 19, 21
Iowa Code § 479B.32.....................................................................................13
Iowa Code § 479B.32(1)................................................................................13
Iowa Code §§ 29C.1, 29C.2(4), 29C.5, 29C.9..............................................10
Pub. L. 96-129, 93 Stat. 989..........................................................................23
Pub. L. 103–272 ............................................................................................23
Pub. L. 103–272, § 1(e) ..................................................................................5

## Rules

Fed. R. App. P. 29(b) ........................................................................................ 1
Fed. R. App. P. 32(a)(5) .................................................................................. 28
Fed. R. App. P. 32(a)(6) .................................................................................. 28
Fed. R. App. P. 32(f) ....................................................................................... 28

## Regulations

49 C.F.R. Part 195 ..................................................................................... 16, 25
49 C.F.R. § 195.2 ............................................................................................15
49 C.F.R. § 195.200 ........................................................................................19
49 C.F.R. § 195.210 ..................................................................... 18, 19, 20, 22, 23
49 C.F.R. § 195.210(a) ............................................................................ 20, 23, 24
49 C.F.R. § 195.210(b) ............................................................................ 20, 24, 25
49 C.F.R. § 195.248 ........................................................................................25
49 C.F.R. § 195.402(c)(10) ....................................................................... 13, 15
49 C.F.R. § 195.59 ..........................................................................................15
49 C.F.R. §§ 195.65, 195.402(c)(12), 195.402(e)(1), 195.417(a), 95.452(i)(1)......10
49 CFR 195.402(d) ........................................................................................10

## Other Authorities

Notice of Proposed Rulemaking, 33 Fed. Reg. 10,213 (Jul. 17, 1968)..................22
Final Rule, 34 Fed. Reg. 15,473 (Oct. 4, 1969).....................................................23

Appellate Case: 23-3760     Page: 6     Date Filed: 05/14/2024 Entry ID: 5393614

# STATEMENT OF INTEREST[1]

The following nonprofit and individual *Amici Curiae* submit this brief pursuant to Fed. R. App. P. 29(b). All Appellants and Appellees consent to its filing.

The Iowa Farmers Union ("IFU") works to strengthen independent family farms through education, legislation, and cooperation, and to provide Iowans with sustainable production, safe food, a clean environment, and healthy communities. IFU is a grassroots member organization of family farmers and ranchers, advocates, and consumers committed to promoting family agriculture in Iowa. Its farm families operate farms ranging from less than two acres to more than 2,000 acres, producing a diverse array of agricultural products, including corn, soybeans, small grains, livestock, dairy, fruits and vegetables, organic and specialty crops, and value-added agricultural goods. The IFU has an extraordinary interest in the outcome of this case, as the potential construction of a hazardous liquid carbon dioxide pipeline will affect the lives and livelihoods of thousands of family farmers throughout Iowa. The IFU and its members have a vested interest in ensuring the safety of family famers and their land, which is a central focus of this appeal.

---

[1] No party's counsel authored this brief in whole or in part. No party or any party's counsel contributed money intended to fund preparation or submission of this brief. Bold Nebraska, a Nebraska-based 501(c)(3) non-profit organization, contributed money intended to fund preparation or submission of this brief. *Amici curiae* have authority to file this brief pursuant to Federal Rule of Appellate Procedure Rule 29(a)(2), as all parties have consented to its filing.

1

In addition, the following individuals join this brief: Mary Powell, Sherrill Webb, Cindy Hansen, Dan Harvey, Kathy Stockdale, Marty Maher, and Brenda Barr (collectively, the "Iowa Landowners"). Each of these individuals owns or controls property in Iowa, including in Shelby and Emmett Counties. The Iowa Landowners have a vested interest in this case because it affects the viability of their land for current and future generations, and potentially jeopardizes the safety of their families and tenants.

## SUMMARY

Congress enacted the Pipeline Safety Act, 49 U.S.C. §§ 60101-60140 ("PSA"), to authorize the Department of Transportation ("DOT") to prescribe national uniform pipeline "safety standards" that apply exclusively to the "owners or operators" of "pipeline facilities" "used or intended to be used" to transport hazardous gases and liquids with regard to their "design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance." 49 U.S.C. §§ 60101(a)(5), 60101(a)(18), 60102(a)(2). However, Congress also prohibited the DOT from prescribing safety standards for "the location or routing of a pipeline facility," 49 U.S.C. § 60104(e), thereby preserving the right of state, tribal, and local governments to regulate pipeline route and location. To ensure that federal "safety standards" apply uniformly among the states, Congress expressly preempted state adoption and

2

enforcement of competing state "safety standards." 49 U.S.C. § 60104(c). By limiting its express preemption provision to the field of "safety standards," Congress preserved the authority of state, tribal, and local governments to regulate pipeline safety outside of this carefully circumscribed field.

Shelby and Story County, Iowa, enacted ordinances that, among other things, establish safety-based setbacks for new pipelines and mitigation standards for pipelines after they are permanently removed from service. Summit Carbon Solutions, LLC ("Summit") brought this action in district court to overturn the ordinances on state and federal preemption grounds. The district court found that the PSA preempted the ordinances. The district court order is in error because the plain language of the PSA's preemption statute does not extend to county regulation of pipeline "location or routing" or to regulation of pipelines that are no longer "used or intended to be used" to transport hazardous liquids. Accordingly, the district court order should be overturned.

## ARGUMENT

### I.  The Scope of Pipeline Safety Act Preemption Is Limited to the Field of Pipeline "Safety Standards" and Does Not Encompass All Matters Related to Pipeline Safety

Where Congress expressly preempts state regulation, the scope of federal preemption is defined in accordance with statutory language. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). An express preemption clause does not immediately end a

3

preemption analysis because "the question of the substance and scope of Congress' displacement of state law still remains." *Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008); *Keller v. City of Fremont*, 719 F.3d 931, 942 (8th Cir. 2013). A court must precisely identify the scope of preemption, and construe express preemption provisions "in light of the presumption against the pre-emption of state police power regulations. This presumption reinforces the appropriateness of a narrow reading . . . ." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992). Matters beyond that scope are not preempted. *Id*.

Although congressional intent is the "ultimate touchstone" of the statutory analysis, *Wyeth*, 555 U.S. at 565 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)), preemptive language must be interpreted in the context of:

> the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.

*Medtronic*, 518 U.S. at 486 (citations and internal quotation marks omitted).

If the express preemption language fails to provide a "reliable indicium" of congressional intent, a court may apply a conflict preemption analysis to particular circumstances. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287-89 (1995) (*Cipollone* does not "obviate the need for analysis of an individual statute's pre-emptive effects"); *Washington Gas Light Co. v. Prince George's County Council*,

4

711 F.3d 412, 422 (4th Cir. 2013). Where Congress has not completely displaced state regulation in a specific area, state law is nullified only to the extent of an actual conflict. *ANR Pipeline Co. v. Iowa State Commerce Com'n*, 828 F.2d 465, 468 (8th Cir. 1987). Under conflict preemption, a state law may be preempted only if it is impossible for regulated parties to comply with both sets of laws, *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963), or where a state law poses an obstacle to the "full purposes and objectives" of Congress. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

A.     **In Its *ANR* and *Kinley* Decisions, this Court Held that Federal Jurisdiction Is Exclusive Within the Scope of the PSA, But It Did Not Determine the Precise Extent of this Scope**

The *ANR* and *Kinley* decisions considered express preemption provisions contained in prior versions of the PSA. 828 F.2d at 468 (construing 49 U.S.C. § 1672(a) (1990)); *Kinley Corp. v. Iowa Utilities Bd.*, 999 F.2d 354, 358-59 (8th Cir. 1993) (construing 49 U.S.C. App. § 2002(d) (1990)). In 1994, Congress repealed and replaced these statutes with 49 U.S.C. § 60104(c), which contains similar language. Pub. L. 103–272, § 1(e), July 5, 1994, 108 Stat. 1308. The Courts held that federal law provides exclusive authority within the scope of federal PSA jurisdiction, but neither defined the precise scope of preemption. 828 F.2d at 472; 999 F.2d at 359. In both cases, Iowa subsumed the entire body of federal safety standards into state law by reference, such that state and federal safety standards were "identical"

5

in scope. 828 F.2d at 467, 469; 999 F.2d at 358-59. Neither court had need to analyze the PSA's precise jurisdictional limits, because the infringement was absolute.

Yet, each decision contained broad statements that the PSA regulates all matters related to pipeline safety. For example, the *ANR* decision held that "state regulatory authority with respect to interstate pipeline safety is preempted." 828 F.2d at 473. The *Kinley* court stated: "Congress has expressly stated its intent to preempt the states from regulating in the area of safety in connection with interstate hazardous liquid pipelines." 999 F.2d at 358. This *dictum* has the potential to cause confusion, because the plain language of 49 U.S.C. § 60104(c) does not use the term "pipeline safety" and the extent of PSA preemption is not as broad as described.

## B. The Plain Language of the PSA Preemption Clause and the Defined Terms Used Therein Craft Precise Limits

Where Congress has spoken "precisely and narrowly" in an express preemption clause, the courts must identify its preemptive scope with equal precision. *See Cipollone*, 505 U.S. at 517. Here, 49 U.S.C. § 60104(c) states: "[a] State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c). Importantly, the terms "safety standards," "pipeline facilities," and "pipeline transportation," are defined by 49 U.S.C. §§ 60102(a)(2), 60101(a)(18) and (19), respectively, and contain precise jurisdictional limits.

Appellate Case: 23-3760     Page: 12     Date Filed: 05/14/2024 Entry ID: 5393614

The term "safety standards" is delimited by 49 U.S.C. §60102(a)(2)(A) and (B). Under subsection (A), "safety standards" may be applied only to "the owners or operators of pipeline facilities." The PSA does not authorize regulation of persons or entities that do not own or operate "pipeline facilities." Under subsection (B), "safety standards" regulate only "the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities." Congress did not provide a general authorization to regulate all pipeline-related activities. Instead, it limited the scope of safety standards to a specified list of discrete activities related to the physical management "pipeline facilities." This list is not all-inclusive. For example, it does not include locating or routing a pipeline, because 49 U.S.C. § 60104(e) excludes this activity from federal regulation.

The PSA defines the term "pipeline facility" to mean "a gas pipeline facility and a hazardous liquid pipeline facility." 49 U.S.C. § 60101(a)(18). "Hazardous liquid pipeline facility" is defined to include "a pipeline, a right of way, a facility, a building, or equipment **used or intended to be used** in transporting hazardous liquid." 49 U.S.C. § 60101(a)(5) (emphasis added). "Transporting hazardous liquid" is defined, in relevant part, to mean "the movement of hazardous liquid by pipeline . . . in or affecting interstate or foreign commerce . . . ." "Hazardous liquids" include petroleum and petroleum products; flammable, toxic, or corrosive nonpetroleum

7

fuels; other substances that the Secretary of Transportation decides pose an unreasonable risk to life or property; and liquid carbon dioxide. 49 U.S.C. §§ 60101(a)(4); 60102(i). "Pipeline transportation" is defined as "transporting gas and transporting hazardous liquid." Combining these elements, PSA jurisdiction is limited to regulation of:

(a) only owners or operators of pipelines;

(b) only when their pipelines are actively used or intended to be used;

(c) to move only certain hazardous liquids;

(d) only with regard to the activities listed in 49 U.S.C. § 60102(a)(2(B).

Each of these elements is essential and limiting.

## C. Congress Intended to Extend PSA Jurisdiction to Only a Portion of the Field of Pipeline Safety

Congress did not federalize all matters conceivably related to pipeline safety. It intended to create national uniform safety standards applicable to owners and operators of pipeline facilities. *Northern Border Pipeline Co. v. Jackson County*, Minn., 512 F. Supp. 1261, 1265 (D. Minn. 1981). Outside this scope, non-federal governments retain jurisdiction over other aspects of pipeline safety. *See Cipollone* at 517. The PSA's preemption language should be interpreted in this broader context to ensure that federal pipeline safety regulation dovetails seamlessly with state, tribal, and local regulation, and to avoid jurisdictional confusion and gaps.

8

According to the Pipeline and Hazardous Materials Safety Administration, ("PHMSA"),[2] the most common pipeline accident causes include corrosion; excavation, natural, and other outside force damage; material/weld failures; equipment failures; and incorrect operation. Some of these causes are within pipeline owner and operator control and are therefore subject to PSA regulation. Others are the result of actions by third-parties or natural forces, such as third-party excavation damage, strikes by farm implements, incompatible adjacent land uses, geohazards, vehicle accidents, accidental fires and explosions, vandalism, and terrorism. While pipeline owners and operators may have some ability to manage these third-party risks, they do not have regulatory power over third-parties and so cannot compel them to undertake pipeline safety efforts. State, tribal, and local governments do have such power. By limiting the scope of PSA preemption to "safety standards" applicable to "owners or operators of pipeline facilities," Congress preserved state, tribal, and local jurisdiction authority to regulate other entities on pipeline safety.

Pipeline spill response policy includes planning, preparing, and training for spills, as well as responding to spills. It requires coordinated action by many actors including pipeline company employees and contractors, and federal, state, tribal, and local law enforcement, firefighting, and emergency medical agencies. The PSA

---

[2] PHMSA pipeline failure causes website (available at https://www.phmsa.dot.gov/incident-reporting/accident-investigation-division/pipeline-failure-causes).

regulations recognize this shared jurisdiction and expressly require that pipeline operators coordinate with and provide information to state, tribal, and local response agencies. 49 C.F.R. §§ 195.65, 195.402(c)(12), 195.402(e)(1), 195.417(a), 95.452(i)(1). Iowa law requires coordinated state, county, and municipal planning and response to "man-made" disasters, including pipeline ruptures, as well as coordination with federal agencies and private companies. Iowa Code §§ 29C.1, 29C.2(4), 29C.5, 29C.9. Often, local emergency personnel will be the first on-site following a rupture and may need to act immediately and independently to protect lives and properties. Even though local government planning and response to pipeline ruptures falls with the broad area of "pipeline safety," it is not subject to PSA safety standards, because they can be applied only to pipeline owners or operators. The PSA regulates emergency planning and response by pipeline operators, 49 CFR 195.402(d), but state, tribal, and local emergency planning and response agencies are regulated by their own laws.

PHMSA has acknowledged that the PSA does not regulate all matters related to pipeline safety. In a September 15, 2023, letter to Summit, PHMSA expressly states that it "continues to support and encourage all three levels of government – federal, state, and local – working collaboratively to ensure the nation's pipelines systems are constructed and operated in a manner that protects public safety and the environment." App. 914 1:22-cv-00020.R.Doc. 78-1, at 16. The letter also

10

recognizes that pipeline safety is a "shared responsibility of federal and state regulators as well as all other stakeholders, including pipeline operators, excavators, property owners, and local governments." App. 917 1:22-cv-00020.R.Doc. 78-1, at 19. It acknowledges that state and local governments have authority to regulate "land use and development along pipeline rights-of-way through zoning, setbacks, and similar measures." App. 916 1:22-cv-00020.R.Doc. 78-1, at 18. PHMSA may not control local land use decisions, because it has no authority to regulate entities that do not own pipelines, such as local governments and neighboring landowners. The letter recognizes that local governments may regulate "local emergency response plans and training with regulators and operators." App. 916 1:22-cv-00020.R.Doc. 78-1, at 18.

While the broad-brush strokes of PSA preemption are clear, the substantive and jurisdictional complexity of this policy area suggest that, where federal and state jurisdiction abut, application of the impossibility and obstacle tests for conflict preemption may be helpful. *Fla. Lime*, 373 U.S. at 142-43; *Hines*, 312 U.S. at 67.

## II. The Pipeline Safety Act Does Not Preempt County Mitigation of Abandoned Hazardous Liquid Pipelines

As of March 1, 2024, PHMSA reported that it regulates 229,443 miles of hazardous liquid pipelines.[3] The U.S. Department of Energy estimates that from

---

[3] PHMSA, *Annual Report Mileage for Hazardous Liquid or Carbon Dioxide Systems* (March 1, 2024) (available at https://www.phmsa.dot.gov/data-and-

30,000 to 96,000 miles of new carbon dioxide pipelines may exist by 2050.[4] The lion's share of this milage is or will be on private land. All of this pipeline mileage will eventually be permanently removed from service.

Abandoned pipelines create potential liabilities and risks, including but not limited to interference with future land uses, collapse under roads and railroads, sinkholes, water drainage, contaminated soils, and loss of cover due to soil and water erosion leading to farm implement damage. These liabilities can be mitigated by, for example, entirely or partially removing abandoned pipe, segmentation to prevent water drainage, filling with cement under roadways, or maintaining pipe in place using cathodic corrosion protection. Mitigating pipelines may require substantial engineering, permitting, and construction efforts and financial resources. The Minnesota Public Utilities Commission recently ordered a pipeline operator to establish a $1.249 billion decommissioning fund for a new 337-mile pipeline (approximately $3.7 million per mile) to be fully funded by 2041.[5] Total nationwide

---

statistics/pipeline/annual-report-mileage-hazardous-liquid-or-carbon-dioxide-systems).
[4] U.S. Department of Energy, *Pathways to Commercial Liftoff: Carbon Management* (April 2023) (available at: https://liftoff.energy.gov/wp-content/uploads/2023/04/20230424-Liftoff-Carbon-Management-vPUB_update.pdf).
[5] *In the Matter of Decommissioning Trust Fund for the Enbridge Energy, Limited Partnership Line 3 Replacement Pipeline*, Docket PL-9/CN-21-823, Order Approving Decommissioning Trust and Appointing Trust Protector (Nov. 14, 2023) (Document ID 202311-200479-01) at 1, 5-7 (available at: https://mn.gov/puc/edockets/).

liability for existing and proposed hazardous liquid pipelines could be in the hundreds of billions of dollars.

## A. The District Court's Extension of Pipeline Safety Act Jurisdiction to Abandoned Pipelines Is Contrary to the Plain Language of the PSA

Shelby County Ordinance Section 8.12 regulates hazardous liquid pipelines after their use "has been discontinued such that there is no longer regulatory oversight of the Pipeline by PHMSA." App. 45 1:22-cv-00020.R.Doc. 1-1, at 16. The ordinance is intended to operate in conjunction with Iowa Code § 479B.32, which authorizes owners of land subject to pipeline easements to seek easement reversion and pipeline removal after five consecutive years of non-use, unless the pipeline is "transporting product or is being actively maintained with reasonable anticipation of a future use." Iowa Code § 479B.32(1). The Ordinance requires that pipeline owners notify the County of abandonment, provides landowners with the right to require removal, and establishes mitigation standards. The Ordinance and Iowa Code § 479B.32 shift liability for abandoned pipeline mitigation to pipeline owners.

The district court found PSA jurisdiction extends to abandoned and discontinued pipelines and ruled that Shelby County's abandonment requirements are expressly preempted by the PSA. The district court based its decision on 49 C.F.R. § 195.402(c)(10), which requires pipeline operators to have a plan for

13

abandoning pipeline facilities including "safe disconnection from an operating pipeline system, purging of combustibles, and sealing abandoned facilities . . . to minimize safety and environmental hazards." App. 972 1:22-cv-00020.R.Doc. 82, at 7. The court also noted that 49 U.S.C. § 60108(b)(6)(A) requires pipeline operators to report abandonment to PHMSA, specifying "whether the facility has been abandoned properly according to applicable United States Government and State requirements." App. 972 1:22-cv-00020.R.Doc. 82, at 7. If the district court's order is affirmed, the federal government will have exclusive jurisdiction to regulate and mitigate hundreds of thousands of miles of current and possible future abandoned hazardous liquid pipelines.

The district court erred because it failed to consider the jurisdictional impact of the definitions of "pipeline facility," 49 U.S.C. § 60101(a)(18), and "hazardous liquid pipeline facility," 49 U.S.C. § 60101(a)(5). PSA safety standards apply only to "pipeline facilities," including "hazardous liquid pipeline facilities," which include "a pipeline, a right of way, a facility, a building, or equipment **used or intended to be used** in transporting hazardous liquid." 49 U.S.C. § 60101(a)(5). (emphasis added). The plain language of this statute makes clear that pipelines that are no longer used and not intended to be used to move hazardous liquids are not "pipeline facilities" under the PSA, and therefore not subject to PSA jurisdiction. Congress did not intend to regulate unused permanently empty pipelines.

Appellate Case: 23-3760     Page: 20     Date Filed: 05/14/2024 Entry ID: 5393614

**B.** **The Federal Pipeline Abandonment Regulations Establish a Process to Determine When PSA Jurisdiction Ends and Do Not Extend Federal Jurisdiction into Perpetuity**

The court misinterpreted the purpose of the federal pipeline abandonment regulations. 49 C.F.R. § 195.2 defines "abandoned" as "permanently removed from service." This definition is consistent with 49 U.S.C. § 60101(a)(5), because a pipeline owner that has permanently removed its pipeline from service has no intention to operate it in the future. Two regulations describe the steps a pipeline operator must take to abandon a pipeline. 49 C.F.R. § 195.59 requires the last operator of an offshore pipeline or an onshore pipeline that crosses under commercially navigable waters to file a report, so that the abandoned pipeline's status and location is recorded for navigation and other purposes. 49 C.F.R. § 195.402(c)(10) requires that all pipeline operators take three actions to convert an operational pipeline into an abandoned pipeline: the pipeline must be: (1) disconnected from other operating pipelines, (2) purged of combustibles, and (3) sealed. This abandonment process is the final federal safety standard applicable to "hazardous liquid pipeline facilities." Once an operator takes these steps, its pipeline is considered "abandoned" (past tense), meaning permanently removed from service.

At the moment in time an operator completes all three steps, its pipeline is no longer used or intended to be used to move hazardous liquids, such that it is no longer

15

a "hazardous liquid pipeline facility" or a "pipeline facility" subject to PSA safety standards. 49 U.S.C. §§ 60101(a)(5), (18), 60102(a)(2). At this moment, PSA jurisdiction ends. The purpose of the 49 U.S.C. § 195.210(c)(10) abandonment process is not to extend PSA jurisdiction into perpetuity, it is to define when PSA jurisdiction terminates. Pipelines do not last forever; neither does PSA jurisdiction.

C.   **Termination of PSA Jurisdiction Upon Abandonment Is Consistent with the Purpose of the PSA and Necessary to Determine When Compliance and Enforcement End**

The purpose of the PSA is to prevent releases of hazardous liquids. It makes sense to terminate PSA jurisdiction once a pipe has been disconnected from operating pipelines, all product has been purged, and the empty pipe sealed, because there is no risk of product release and no practical need to operate, maintain, inspect, and repair a pipeline in accordance with PSA safety standards.

The abandonment process is also critical for efficient administration, because it defines when pipeline operators may stop paying for expensive inspection, maintenance, and repair efforts, and when PHMSA may stop inspection and enforcement for a pipeline. Absent this abandonment process, compliance and enforcement would unnecessarily continue into perpetuity.

Moreover, PHMSA has no regulations or capacity to regulate pipelines post-abandonment. PHMSA's hazardous liquid regulations, 49 C.F.R. Part 195, do not contain any standards or regulatory process that could be used by PHMSA to resolve

16

mitigation disputes between abandoned pipeline owners and landowners, or to manage mitigation activities such as pipeline removal. The fate of abandoned pipelines is best managed by state or local regulation, not a nationwide federal program. Absent clear Congressional authorization, the Court should not extend federal jurisdiction into the field of post-abandonment pipeline mitigation.

## III. County Consideration of Safety When Enacting a Setback Ordinance Is Not a Safety Standard

Pipelines fail. When hazardous liquid pipelines rupture the result may include death, bodily injury, and/or significant environmental harm. *See Williams Pipe Line Co. v. City of Mounds View, Minn.*, 651 F. Supp. 544, 545 (D. Minn. 1986) (gasoline pipeline rupture killed two and injured a third person); *Olympic Pipe Line Co. v. City of Seattle*, No. C03-2343L, 2003 WL 27392855 at *1 (W.D. Wash. 2003) (gasoline pipeline rupture killed three, ecologically devastated area, and caused millions of dollars of property damage). Routing a new pipeline away from populated areas and sensitive environments reduces the potential for harm in the event of a rupture. Route selection can also reduce potential threats to pipelines posed by geohazards, such as unstable soils, and adjacent incompatible human land uses, such as mining. Safety is a critically important factor that should be incorporated into all hazardous liquid pipeline location and routing decisions. The question here is, may a local government consider safety in enacting setbacks, or does mere consideration convert

a setback into a "safety standard" within the meaning of 49 U.S.C. § 60102(a)(2), such that the setback is preempted by 49 U.S.C. § 60104(c)?

Summit argues that the PSA authorizes federal routing safety standards, and that such standards exist in the form of 49 C.F.R. § 195.210, such that Story and Shelby Counties were preempted from considering safety when they enacted their setback ordinances. The Counties argue 49 U.S.C. § 60104(e) prohibits PHMSA from "prescrib[ing] the location or route of a pipeline facility" through safety standards issued pursuant to 49 U.S.C. § 60102(a)(2), such that the entire field of hazardous liquid pipeline routing, including considerations of safety and the general welfare, has been reserved to state, tribal, and local governments by Congress.

## A. The District Court Analysis of Consideration of Safety in County Setback Enactment Is Flawed

The district court did not apply a federal preemption analysis to the Shelby County setback, and instead preempted it under state law. In contrast, it held that the Story County setback is preempted by federal law and state law. App. 1812-1814 4:22-cv-00383.R.Doc. 55, at 31-33. Initially, the district court quoted the express preemption language in 49 U.S.C. §60104(c) but did not analyze it or its embedded defined terms to determine the precise scope of PSA jurisdiction. App. 1810 4:22-cv-00383.R.Doc. 55, at 29. Instead, it relied on the *ANR* and *Kinley* decisions for their broad *dictum* that the PSA regulates all matters related to pipeline safety. App.

18

1798, 1811-1812, 1814 4:22-cv-00383.R.Doc. 55, at 17, 30-31, 33. It also cited 49 U.S.C. § 60102(a)(2) to support its finding that the PSA "delegates sole authority to enact safety provisions," App. 1810 4:22-cv-00383.R.Doc. 55, at 29, but it did not analyze any of the jurisdictional limits in 49 U.S.C. § 60102(a)(2) and the defined terms used therein.

Rather than conduct a close analysis of 49 U.S.C. § 60104(c) and 49 U.S.C. § 60102(a)(2) to determine Congressional intent, the court instead relied on evidence of preemption in the PSA regulations. The court cited 49 U.S.C. § 60102(a)(2)(B) as a statutory foundation and noted that it authorizes federal safety standards for "construction" of pipeline facilities. App. 1812 4:22-cv-00383.R.Doc. 55, at 31. It then cited 49 C.F.R. § 195.200, which describes the scope of federal construction safety standards in Subpart D, the subpart containing construction safety standards. App. 1812 4:22-cv-00383.R.Doc. 55, at 31. Finally, it cited 49 C.F.R. § 195.210, which is within Subpart D and states in its entirety:

### § 195.210 Pipeline Location

(a) Pipeline right-of-way must be selected to avoid, as far as practicable, areas containing private dwellings, industrial buildings, and places of public assembly.

(b) No pipeline may be located within 50 feet (15 meters) of any private dwelling, or any industrial building or place of public assembly in which persons work, congregate, or assemble, unless it is provided with at least 12 inches (305 millimeters) of cover in addition to that prescribed in § 195.248.

19

App. 1812-1813 4:22-cv-00383.R.Doc. 55, at 31-32. The district court reasoning appears to be that because 49 U.S.C. § 60102(a)(2)(B) authorizes construction standards, and 49 C.F.R. § 195.210 falls within Subpart D, that therefore the "location" standards in 49 C.F.R. § 195.210 are construction standards authorized by the statute. Put another way, the district court found that "location" falls within the realm of "construction," and therefore location safety standards are authorized as a part of construction standards by 49 U.S.C. § 60102(a)(2)(B).

Next, the district court reasoned that because 49 C.F.R. § 195.210(a) regulates avoidance of structures and 49 C.F.R. § 195.210(b) is, it claims, a 50-foot setback, they conflict with and therefore preempt Story County's quarter-mile setback. App. 1813-1814 4:22-cv-00383.R.Doc. 55, at 32-33. Accordingly, it found that the Story County Ordinance "creates a dual safety regulation that competes with the Secretary of Transportation's broad spectrum of duties" and "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" App. 1812 4:22-cv-00383.R.Doc. 55, at 31 (citation omitted), and held that the PSA preempted the Ordinance. App. 1814 4:22-cv-00383.R.Doc. 55, at 33.

The district court also considered the impact of 49 U.S.C. § 60104(e), which states: "[t]his chapter does not authorize the Secretary of Transportation to prescribe the location or routing of a pipeline facility." App. 1813 4:22-cv-00383.R.Doc. 55, at 32. It reconciled the tension between 49 U.S.C. § 60104(e) and 49 C.F.R. §

20

195.210 by reasoning that "while the Secretary cannot dictate where a pipeline should go through Story County or along a specific location within the area, once a location or routing of a pipeline is chosen, the PHMSA regulations dictate it cannot be within the setback requirements set forth in the regulation." App. 1814 4:22-cv-00383.R.Doc. 55, at 33. The court essentially ruled that a state or county may determine the overall route, but 49 C.F.R. § 195.210(b) prohibits construction with 50 feet of a structure along this route. For the reasons provided below, the district court decision is in error.

**B.  The Plain Language of 49 U.S.C. § 60104(e) Bars Federal Location and Routing Safety Standards**

49 U.S.C. § 60104(e) states: "[t]his chapter does not authorize the Secretary of Transportation to prescribe the location or routing of a pipeline facility." This language unambiguously prohibits use of any part of the PSA – including the safety standard authority provided by 49 U.S.C. § 60102(a)(2) – to prescribe location or route. If PHMSA were to issue and then enforce location and route safety standards, it would "prescribe the location or routing of a pipeline facility" and violate 49 U.S.C. § 60104(e). Therefore, the PSA expressly bars federal safety standards for hazardous liquid pipeline location or route.

Moreover, the language in 49 U.S.C. § 60104(e) is unqualified. It does not contain even a suggestion that Congress intended to prohibit County consideration

21

of safety while allowing routing based on any other relevant factor. If Congress intended this result, it would have expressly authorized location-based safety standards for hazardous liquid pipelines in 49 U.S.C. § 60102 as it did for liquified natural gas ("LNG") pipelines in 49 U.S.C. § 60103(a). The first sentence of 49 U.S.C. § 60103(a) states: "[t]he Secretary of Transportation shall prescribe minimum safety standards for deciding on the location of a new liquefied natural gas pipeline facility." No similar authorization exists in 49 U.S.C. § 60102. The comparative lack of express Congressional authorization for hazardous liquid pipeline location and route safety standards is strong evidence that Congress has not authorized them.

The plain language of 49 U.S.C. § 60104(e) makes clear that the entire field of hazardous liquid pipeline location and routing – without reservation – is outside of PSA jurisdiction. *See Washington Gas Light*, 711 F.3d at 422 (Congress did not intend to occupy the field of facility siting). Therefore, state, tribal, and local governments may consider safety when enacting pipeline facility setbacks, other land use controls, or state routing permitting statutes without fear of PSA preemption. *Portland Pipe Line Corporation v. City of South Portland,* 288 F. Supp. 3d 321, 433-34 (D. Me. 2017) (city consideration of safety in enacting ordinance restricting pipeline development not preempted by PSA); *Bad River Band v. Enbridge Energy Company, Inc.*, 626 F. Supp. 3d 1030, 1048-49 (W.D. Wisc. 2022)

(tribe consideration of route safety in rejection of easement extension not preempted by PSA).

## C. 49 C.F.R. § 195.210 Does Not Provide a Basis for Preemption

Despite the clear language of 49 U.S.C. § 60104(e), the district court interpreted 49 C.F.R. § 195.210 as containing location-based safety standards and used this regulation as the basis for preemption. The language in 49 C.F.R. § 195.210 traces back to the very first hazardous liquid pipeline rulemaking initiated in 1968 and completed in 1969. *Notice of Proposed Rulemaking*, 33 Fed. Reg. 10,213, 10,220 (Jul. 17, 1968) (proposed codification at § 180.210); *Final Rule*, 34 Fed. Reg. 15,473, 75, 79 (Oct. 4, 1969) (codified at § 195.210). The language in the 1969 Final Rule is identical to the current regulation.

A decade later, Congress enacted the Hazardous Liquid Pipeline Safety Act of 1979 ("HLPSA"). Pub. L. 96-129, 93 Stat. 989 (Nov. 30, 1979). The HLPSA contained the following language prohibiting use of the HLPSA to locate or route pipelines:

> (4) "pipeline facilities" includes, without limitation, new and existing pipe, rights-of-way, and any equipment, facility, or building used or intended for use in the transportation of hazardous liquids but **"rights-of-way" as used in this chapter does not authorize the Secretary to prescribe the location or the routing of any pipeline facility**;

49 U.S.C. § 2001(4) (1990) (emphasis added). This language remained in the U.S. Code until 1994 when it was replaced by the broader and clearer language of 49 U.S.C. § 60104(e). Pub. L. 103–272, July 5, 1994, 108 Stat 745. Both of these statutory prohibitions on federal routing were enacted after and supersede any contrary effect of 49 C.F.R. § 195.210.

The plain language of 49 U.S.C. § 60104(e) voids 49 C.F.R. § 195.210(a). If PHMSA attempted to enforce this regulation by ordering a pipeline developer to change the location or route of a proposed pipeline because it does not adequately avoid "areas containing private dwellings, industrial buildings, and places of public assembly," PHMSA would "prescribe the location or routing of a pipeline facility" and thereby violate 49 U.S.C. § 60104(e). If 49 C.F.R. § 195.210(a) were found to regulate pipeline route, it would conflict with and therefore preempt the undisputed right of state, tribal, and local governments to determine the route of hazardous liquid pipelines. Fortunately, Congress used 49 U.S.C. § 60104(e) to draw a bright line between the field of pipeline location and routing and the field of pipeline safety standards, making 49 C.F.R. § 195.210(a) a vestigial regulation without effect.

The district court found that 49 C.F.R. § 195.210(b) establishes a setback and therefore regulates location. This finding is in error. The regulation states:

> No pipeline may be located within 50 feet (15 meters) of any private dwelling, or any industrial building or place of public assembly in which persons work, congregate, or assemble, **unless it is provided with at least 12 inches**

24

**(305 millimeters) of cover in addition to that prescribed in § 195.248**.

(Emphasis added.) The plain language of subsection (b) allows construction within 50 feet of a structure; it merely requires an additional foot of cover when a pipeline is closer than 50 feet, a requirement that can always be met. In contrast, the definition of "setback" is "[t]he minimum amount of space required between a lot line and a building line." Setback Definition, *Black's Law Dictionary*, 11th edition, available at Westlaw. Within a setback, construction is prohibited. Subsection (b) does not establish a minimum distance between a pipeline and structure. Instead, it expressly allows construction within 50 feet, provided the pipeline is buried a foot deeper, making it a depth of cover requirement that supplements the general depth of cover requirements in 49 C.F.R. § 195.248. Because 49 C.F.R. § 195.210(b) does not "prescribe the location or routing of a pipeline facility," it is not a location safety standard barred by 49 U.S.C. § 60104(e) and is not evidence that Congress intended to preempt county consideration of safety when enacting setback ordinances. No other regulations in 49 C.F.R. Part 195 purport to impose safety standards for the location or route of a pipeline. Therefore, PSA regulations do not control the location or routing of hazardous liquid pipeline facilities.

The district court's preemption analysis is in error because it did not correctly determine the scope of preemption intended by Congress based on the plain language of 49 U.S.C. §§ 60104(c), 60102(a)(2), and 60104(e). The field of pipeline location

Appellate Case: 23-3760     Page: 31     Date Filed: 05/14/2024 Entry ID: 5393614

and routing lies entirely outside of PSA jurisdiction. Federal law does not bar County consideration of safety when establishing setbacks.

**D.    Consideration of Safety in Locating and Routing Hazardous Liquid Pipelines Does Not Obstruct the Purposes and Objectives of the PSA**

Route permitting always precedes the application of PSA safety standards. Once route permitting is completed, PSA design and construction standards can be applied fully to a selected route, regardless of the reasons for its selection. The field of pipeline location and routing is entirely separate from the field of pipeline safety standards. Location and route permitting determine **if and where** a pipeline will be constructed. PSA safety standards regulate **how** an approved pipeline will be designed, constructed, operated, inspected, and maintained.

1.    *Location and Route Permitting Decisions Are a Prerequisite to Application of PSA Safety Standards*

State, tribal, and local routing decisions are a prerequisite to application of PSA safety standards. Indeed, a non-federal routing authority could deny a construction permit, in which case the pipeline developer's intent to construct a hazardous liquid pipeline facility would be terminated and the pipeline would never be constructed. *See Washington Gas Light*, 711 F.3d at 421 (the power to preclude a proposed pipeline facility is not a safety standard); *Portland Pipeline*, 288 F. Supp. 3d at 430 ("An outright ban on pipelines altogether . . . does not conflict with the goal of the PSA, which is imposing national standards to improve pipeline safety.").

26

Application of federal design and construction standards is not possible until the location or route of a hazardous liquid pipeline facility is finally determined by a state, tribal, or local routing authority. While a pipeline developer may initiate design efforts before a route permit is approved, such design efforts are contingent. A route permit could dramatically change the location, route, and length of a proposed pipeline and require a complete re-design in accordance with PSA safety standards. Once a route is determined, all the PSA design, construction, inspection, operation, and maintenance standards can be applied in full to that route.

2. *Federal Safety Standards Apply Fully to a New Pipeline Regardless of the Policy Factors Considered in Route Selection*

It is undisputed that non-federal agencies may select hazardous liquid pipeline routes based on multiple policy factors, such as economic, environmental, and aesthetic impacts. Since PSA safety standards apply in full to any route chosen by a non-federal routing agency, the policy factors used in route selection are irrelevant to the full application of federal safety standards. A route could be chosen solely for economic reasons, or the exact same route could be chosen solely for safety reasons, but in either case the federal safety standards would apply identically and fully. Assuming the State of Iowa selects a route for Summit's proposed pipeline, PSA safety standards will apply fully to that route regardless of whether the state considers the Story County setback.

27

**E.     Nothing in the PSA Indicates that Congress Intended to Prohibit Consideration of Safety in Location and Routing Decisions at All Levels of Government**

49 U.S.C. § 60104(e) bars PHMSA from prescribing location or route. Therefore, PHMSA cannot consider safety in pipeline routing decisions. Summit argues that the County, and by extension states and tribes, also may not consider safety in routing. If Summit is correct then the practical result would be to bar all levels of government from considering safety when routing hazardous liquid and carbon dioxide pipelines, thereby leaving consideration of safety in route selection wholly to pipeline developer discretion. There is no evidence in the PSA that Congress intended this result. A prohibition on federal, state, **and** local consideration of safety in routing requires express congressional direction toward this end, because matters not regulated by federal law are reserved to the states. *Northern States Power Co. v. State of Minn.*, 447 F.2d 1143, 1146 (8th Cir. 1971).

## CONCLUSION

For the foregoing reasons, the *Amici Curiae* respectfully request this Court reverse the District Court's final judgments.

Respectfully submitted,

*/s/ Brian E. Jorde*
Brian E. Jorde, AT0011638
Domina Law Group PC LLO
2425 South 144th Street
Omaha, Nebraska 68144

28

402-493-4100

*Counsel of Record for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,493 words according to the word count function of Microsoft Word.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

This document complies with the requirements of 8th Cir. R. 28(A)(h) because this brief has been generated as a PDF from the original word processing file, so that the text of the electronic version of the brief may be searched and copied, and because this document has been scanned for viruses that confirmed the document is virus-free.

*/s/ Brian E. Jorde*

Appellate Case: 23-3760    Page: 35    Date Filed: 05/14/2024 Entry ID: 5393614

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2024, I filed the foregoing document with the Clerk of the United States Court of Appeals for the Eighth Circuit using the CM/ECF system, causing notice of such filing to be served on all parties' counsel of record.

*/s/Brian E. Jorde*

Appellate Case: 23-3760    Page: 36    Date Filed: 05/14/2024 Entry ID: 5393614