Nos. 23-3758, 23-3760

# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

WILLIAM COUSER and SUMMIT CARBON SOLUTIONS, LLC,
*Plaintiffs-Appellees*,

v.

SHELBY COUNTY, IOWA, et al., and STORY COUNTY, IOWA, et al.,
*Defendants-Appellants.*

Appeal from the United States District Court for the
Southern District of Iowa, Nos. 1:22-CV-00020, 4:22-cv-00383

## BRIEF OF PLAINTIFFS-APPELLEES
## WILLIAM COUSER AND SUMMIT CARBON SOLUTIONS, LLC

Bret A. Dublinske
Brant M. Leonard
Kristy Dahl Rogers
**FREDRIKSON & BYRON, P.A.**
111 East Grand Avenue, Suite 301
Des Moines, IA 50309
(515) 242-8900
bdublinske@fredlaw.com
bleonard@fredlaw.com
krogers@fredlaw.com

Ryan G. Koopmans
**KOOPMANS LAW GROUP LLC**
500 East Court Avenue, Suite 420
Des Moines, IA 50309
(515) 978-1140
ryan@koopmansgroup.com

Brian D. Boone
Michael R. Hoernlein
**ALSTON & BIRD LLP**
1120 South Tryon Street, Suite 300
Charlotte, NC 28203-6818
(704) 444-1000
brian.boone@alston.com
michael.hoernlein@alston.com

*Attorneys for William Couser and Summit Carbon Solutions, LLC*

## SUMMARY OF THE CASE

Summit Carbon Solutions, LLC is developing an interstate pipeline project that will capture carbon dioxide ($CO_2$) from ethanol plants and other carbon-emitting facilities in five states, including Iowa, and deliver it to sequestration sites in North Dakota. In Iowa, as in other states, both federal and state authorities will regulate that pipeline.

Appellants are two Iowa counties who also want to regulate the pipeline. More than a year after Summit filed its permit application with the Iowa Utilities Board, each county passed an ordinance that would, among other things, dictate how far away the pipeline must be from homes, hospitals, and schools and that would impose obligations on all pipeline companies to create emergency management plans.

William Couser, a farmer in Iowa, and Summit sued both Counties because the federal Pipeline Safety Act preempts the ordinances' safety-focused provisions and Iowa Code Chapter 479B preempts the ordinances' other operative provisions. In each case, the district court granted summary judgment in Summit's favor. The Counties appeal.

Appellees request 20 minutes per side for oral argument.

i

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellee Summit Carbon Solutions, LLC filed its corporate disclosure statement with the Court on August 16, 2023. That statement remains accurate as of the filing of this brief. As required by Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, Summit restates the following disclosures to the Court:

1.     Summit is owned by Summit Carbon Holdings, LLC and SCS MgmtCo, LLC.

2.     No publicly held corporation owns more than 10% of Summit Carbon Holdings, LLC's or SCS MgmtCo, LLC's stock.

Appellate Case: 23-3760     Page: 3     Date Filed: 07/02/2024 Entry ID: 5409664

# TABLE OF CONTENTS

SUMMARY OF THE CASE ......................................................... i

CORPORATE DISCLOSURE STATEMENT .......................................... ii

TABLE OF AUTHORITIES ......................................................v

STATEMENT OF ISSUES ...................................................... 1

STATEMENT OF THE CASE ................................................... 2

    A.   Summit's carbon capture and sequestration project. ....... 2

    B.   Federal and state pipeline regulation. ............................. 3

    C.   The challenged county pipeline regulations. ................... 6

SUMMARY OF THE ARGUMENT ...............................................17

STANDARD OF REVIEW .....................................................18

ARGUMENT ...................................................................19

    I.    THE FEDERAL PIPELINE SAFETY ACT PREEMPTS THE COUNTIES' ORDINANCES. .......................................19

        A.   Federal law, as this Court has repeatedly held, precludes state decision-making in the area of pipeline safety "altogether." ...........................................19

        B.   The ordinances' requirements that pipelines keep a "minimum distance" from certain structures and public areas are preempted safety standards. ............................26

        C.   The emergency response and abandonment provisions are preempted safety standards. ....................................38

    II.   IOWA LAW PREEMPTS ANY REMAINING PROVISION OF THE COUNTIES' ORDINANCES THAT FEDERAL LAW DOES NOT PREEMPT. .............................................41

CONCLUSION....................................................................56

Appellate Case: 23-3760    Page: 4    Date Filed: 07/02/2024 Entry ID: 5409664

CERTIFICATE OF COMPLIANCE. ......................................................58

CERTIFICATE OF SERVICE ............................................................59

Appellate Case: 23-3760    Page: 5    Date Filed: 07/02/2024 Entry ID: 5409664

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Allstate Indem. Co. v. Rice,*
 755 F.3d 621 (8th Cir. 2014)..............................................................54

*ANR Pipeline Co. v. Iowa State Com. Comm'n,*
 828 F.2d 465 (8th Cir. 1987)....................................................... passim

*BeeRite Tire Disposal/Recycling, Inc. v. City of Rhodes,*
 646 N.W.2d 857 (Iowa Ct. App. 2002) .........................................54, 55

*English v. Gen. Elec. Co.,*
 496 U.S. 72 (1990) ............................................................................27

*Exxon Corp. v. U.S. Sec'y of Transp.,*
 978 F. Supp. 946 (E.D. Wash. 1997) .................................................24

*Goodell v. Humboldt County,*
 575 N.W.2d 486 (Iowa 1998) ....................................................... passim

*Iowa Grocery Indus. Ass'n v. City of Des Moines,*
 712 N.W.2d 675 (Iowa 2006) ......................................................54, 55

*Johnson v. Securitas Sec. Servs. USA, Inc.,*
 769 F.3d 605 (8th Cir. 2014)..............................................................18

*Kinley Corp. v. Iowa Utils. Bd.,*
 999 F.2d 354 (8th Cir. 1993).......................................................passim

*Lorillard v. Pons,*
 434 U.S. 575 (1978) ....................................................................26, 32

*Nat. Gas Pipeline Co. of Am. v. R.R. Comm'n,*
 679 F.2d 51 (5th Cir. 1982) ...............................................................39

*Tex. Midstream Gas Servs. LLC v. City of Grand Prairie,*
 608 F.3d 200 (5th Cir. 2010).................................................34, 35, 36

Appellate Case: 23-3760     Page: 6     Date Filed: 07/02/2024 Entry ID: 5409664

*United States v. Eagleboy,*
200 F.3d 1137 (8th Cir. 1999) ........................................................... 5, 6

*Wash. Gas Light Co. v. Prince George's County Council,*
711 F.3d 412 (4th Cir. 2013) ......................................................... 35, 36

**STATUTES**

49 U.S.C. § 1672(a)(1) (1993) ............................................................... 20

49 U.S.C. § 2002(d) (1993) ................................................................... 20

49 U.S.C. § 60101(a)(4) ....................................................................... 24

49 U.S.C. § 60101(a)(18) ..................................................................... 33

49 U.S.C. § 60102(i)(1) ....................................................................... 24

49 U.S.C. § 60102(a)(1) .................................................................... 3, 19

49 U.S.C. § 60102(a)(2) ....................................................................... 20

49 U.S.C. § 60102(a)(2)(A) .................................................................. 38

49 U.S.C. § 60103(a) ........................................................................... 33

49 U.S.C. § 60104(c) ................................................................. 17, 20, 38

49 U.S.C. § 60104(e) ................................................................. 29, 30, 33

Iowa Code Chapter 479B ............................................................. passim

Iowa Code § 6B.2B ............................................................................. 51

Iowa Code § 331.301(6) ....................................................................... 44

Iowa Code § 479B.1 ......................................................................... 4, 42

Iowa Code § 479B.3 ............................................................................. 49

Iowa Code § 479B.4 ............................................................................... 4

Iowa Code § 479B.5 ............................................................................... 4

Appellate Case: 23-3760    Page: 7    Date Filed: 07/02/2024 Entry ID: 5409664

Iowa Code § 479B.5(7) ...........................................................51

Iowa Code § 479B.8...........................................................4, 46

Iowa Code § 479B.9...........................................................4, 46

Iowa Code § 479B.16...........................................................51

Iowa Code § 479B.20 ............................................... 49, 50, 53

Iowa Code § 479B.20(5) ...........................................................53

Iowa Code § 479B.32 ...........................................................50

Iowa Code § 479B.32(4) ...........................................................50

Pub. L. No. 90–481, 82 Stat. 1003 .......................................31

Pub. L. No. 96-129, 93 Stat. 989, 999 ..................................32

Pub. L. No. 103–272, 108 Stat. 745 ...............................19, 25

**OTHER AUTHORITIES**

49 C.F.R. parts 190–99 ...........................................................3

49 C.F.R. Part 195 ...........................................................24

49 C.F.R. § 195, App. A ...........................................................24

49 C.F.R. § 195.210 ...........................................................32

49 C.F.R. § 195.210(a) ...........................................................33

49 C.F.R. § 195.402(c)(10) ...........................................................41

49 C.F.R. § 195.402(e) ...............................................38, 40

49 C.F.R. § 195.403 ...............................................39, 40

34 Fed. Reg. 15473, 15475 (Oct. 4, 1969)..............................32

46 Fed. Reg. 38357, 38366 (July 27, 1981) ............................32

Appellate Case: 23-3760    Page: 8    Date Filed: 07/02/2024 Entry ID: 5409664

199 Iowa Admin. Code ch. 9 ....................................................49

H.F. 368 § 3, 90th Gen Assemb., Reg. Sess. (Iowa 2023) ......................52

H.J., 90th Gen. Assemb., Reg. Sess. 725 (Iowa 2023) ...........................53

*In re Summit Carbon Sols.*,
    No. HLP-2021-0001 (Iowa Utils. Bd. June 25, 2024)..........................6

Iowa Const. art. III, § 38A ......................................................41

Appellate Case: 23-3760     Page: 9     Date Filed: 07/02/2024 Entry ID: 5409664

## STATEMENT OF ISSUES

1.  Whether the district court correctly held that the federal Pipeline Safety Act preempts the safety-focused provisions of the Counties' ordinances.

    -   Pipeline Safety Act, 49 U.S.C. §§ 60101 *et seq.*

    -   *ANR Pipeline Co. v. Iowa State Com. Comm'n*, 828 F.2d 465 (8th Cir. 1987).

    -   *Kinley Corp. v. Iowa Utils. Bd.*, 999 F.2d 354 (8th Cir. 1993).

2.  Whether the district court correctly held that the Counties' ordinances conflict with, and are therefore preempted by, Iowa's comprehensive statutory permitting scheme for pipelines.

    -   Iowa Const. art. III, § 38A.

    -   Iowa Code ch. 479B.

    -   *Goodell v. Humboldt County*, 575 N.W.2d 486 (Iowa 1998).

1

## STATEMENT OF THE CASE

**A.    Summit's carbon capture and sequestration project.**

Summit is developing an interstate project that will capture $CO_2$ emitted by ethanol plants (and some fertilizer plants) and transport it to underground geologic wells in North Dakota where it will be permanently stored. App. 1116–17; Story R. Doc. 30-3, at 30–31.[1] At the time the district court granted summary judgment, Summit had contracted with more than thirty companies throughout Iowa, Nebraska, Minnesota, South Dakota, and North Dakota to capture, transport, and store the $CO_2$ emitted from their facilities. *Id*.

By storing $CO_2$ underground instead of emitting into the atmosphere, the ethanol plants will be able to sell their product in markets, like California, that have enacted low-carbon fuel standards. App. 191; Shelby R. Doc. 47-2, at 1. The safest, most efficient, and only financially feasible way to transport $CO_2$ from the ethanol plants to the storage sites in North Dakota is by pipeline—which is what Summit intends to do. App. 192; Shelby R. Doc. 47-2, at 2.

---

[1] "Story R. Doc." refers to the docket in *Couser v. Story County*, Case No. 4:22-cv-00383. "Shelby R. Doc." refers to *Couser v. Shelby County*, Case No. 1:22-cv-00020.

Appellate Case: 23-3760     Page: 11     Date Filed: 07/02/2024 Entry ID: 5409664

Summit is constructing an interstate pipeline that will span more than 2,000 miles throughout the five states. App. 191; Shelby R. Doc. 47-2, at 1. In Iowa alone, the pipeline will traverse 700 miles through nearly a third of the state's 99 counties, connecting at least twelve separate ethanol plants. App. 17; Shelby R. Doc. 1, at 7.

## B. Federal and state pipeline regulation.

Summit's pipeline is regulated at both the federal and state level. Like all hazardous liquid pipelines in the United States, the pipeline is subject to the jurisdiction of the Pipeline and Hazardous Materials Safety Administration, or PHMSA, an agency within the U.S. Department of Transportation that regulates pipeline safety. To "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities" (49 U.S.C. § 60102(a)(1)), PMHSA has adopted minimum safety standards for the design, construction, testing, operation and maintenance of natural gas and hazardous liquid pipelines. *See* 49 C.F.R. parts 190–99.

In Iowa, Summit is also regulated by the Iowa Utilities Board, which the Iowa legislature has given "the authority" to "approve the location and route of hazardous liquid pipelines" and regulate pipelines

3

"to protect landowners and tenants from environmental or economic damages which may result from the construction, operation, or maintenance of a hazardous liquid pipeline." Iowa Code § 479B.1. To construct a pipeline in Iowa, a pipeline company must submit a detailed petition to the Iowa Utilities Board that, among things, includes a description and map of proposed route, the "possible use of alternative routes," a description of private highways, waters, and streams that the pipeline will cross, and the "inconvenience or undue injury which may result to property owners as a result of the proposed project." *Id.* § 479B.5. The company must also hold public "informational meetings" in each county where the pipeline will be located. *Id.* § 479B.4.

After affected parties are given the opportunity to intervene and present pre-filed testimony, the Utilities Board conducts an evidentiary hearing where it "examine[s] the proposed route" (Iowa Code § 479B.8) and then denies the request or grants a permit "in whole or in part upon terms, conditions, and restrictions as to location and route as it determines to be just and proper." *Id.* § 479B.9.

Summit started the Utilities Board permitting process three years ago, filing a request in August 2021 to hold informational meetings in 31

4

Iowa counties (including Story and Shelby) and a map of the initial route.[2] *See also* Story R. Doc. 36-1, at 3. Following the completion of those meetings, Summit filed an extensive permit application in January 2022. App. 185–202; Shelby R. Docs. 47-1, 47-2. Over the course of the next two years, Summit's application was (as the district court put it) "the subject of extensive administrative proceedings." App. 1784; Story R. Doc. 55, at 3; Add. 50. The Utilities Board held an eight-week hearing in September, October, and November 2024, with a record of nearly 2,000 exhibits and a docket of 7,600 filings.[3] After extensive post-hearing briefing for multiple parties, on June 25, 2024, the Utilities Board issued a 507-page

---

[2] Request for Public Informational Meetings and Preliminary Map, IUB Docket HLP-2021-0001, available at https://efs.iowa.gov/filing/4218259. In its summary judgment ruling, the district court also cited the Utilities Board docket and provided the link to the Utilities Board's online docket. App. 1784 n.1; Story R. Doc. 55, at 3 n.1; Add. 50 n.1. The amici have done the same. To the extent the Utilities Board filings and orders are used to "flesh out" the context of the preemption arguments and not as "new evidence on a disputed question of fact," the Court can take judicial notice of the documents on appeal as they are "akin to judicial opinions, treatises, law review articles, public records, and the like that may be cited for the first time on appeal." *United States v. Eagleboy*, 200 F.3d 1137, 1140 (8th Cir. 1999).

[3] *IUB Concludes Public Evidentiary Hearing for Proposed Summit Carbon Pipeline*, Iowa Utils. Bd. (Nov. 9, 2023), https://iub.iowa.gov/press-release/2023-11-09/iub-concludes-public-evidentiary-hearing-proposed-summit-carbon-pipeline.

Appellate Case: 23-3760     Page: 14     Date Filed: 07/02/2024 Entry ID: 5409664

decision granting Summit a permit to construct a $CO_2$ pipeline within a specified route.[4] *See* Final Decision & Order, *In re Summit Carbon Sols.*, No. HLP-2021-0001 (Iowa Utils. Bd. June 25, 2024).[5] Among other things, that order "establish[ed] the overall route of Summit Carbon's proposed hazardous liquid pipeline route" and found that Summit's pipeline "will provide a service that is in the public convenience and necessity." *Id.* at 55, 248.

## C. The challenged county pipeline regulations.

Summit is following the relevant regulations of both PHMSA and the Utilities Board. But Appellants, Shelby County and Story County, have also passed ordinances that purport to regulate Summit's pipeline. In fact, one of the ordinances calls out Summit by name.

---

[4] The Utilities Board issued its decision after the district court entered summary judgment but, as noted in footnote 2, this Court may take judicial notice of the order, as it is "akin to judicial opinions, treatises, law review articles, public records, and the like that may be cited for the first time on appeal." *Eagleboy*, 200 F.3d at 1140 (citing cases).

[5] Available at: https://wcc.efs.iowa.gov/cs/idcplg?IdcService=GET_FILE&RevisionSelectionMethod=latest&allowInterrupt=1&dDocName=2147516&noSaveAs=1&utm_medium=email&utm_source=govdelivery.

## Story County

On October 25, 2022—more than ten months after Summit filed its application and detailed route with the Utilities Board—the Story County Board of Supervisors enacted Ordinance 306. App. 1099; Story R. Doc. 30-3, at 13. Ordinance No. 306 imposed several requirements for the construction and operation of hazardous liquid pipelines beyond those established by the Utilities Board under Iowa Code Chapter 479B or by PHMSA under the Pipeline Safety Act. App. 1099; Story R. Doc. 30-3, at 13. Among other things, Ordinance No. 306 requires (1) that $CO_2$ pipelines maintain a minimum distance from dwellings and places of assembly, (2) that $CO_2$ pipelines be buried at a minimum depth, and (3) that $CO_2$ pipeline companies submit a detailed emergency preparedness plan that includes, among other things, modeling that takes into account $CO_2$ levels "that are immediately dangerous to life or health." App. 1101–06; Story R. Doc. 30-3, at 15–20. (Ordinance No. 306 §§ 86.16.1.A, B, C, D).

The setback distances were based on what County staff believed to be concentration levels of $CO_2$ that "cause dizziness, confusion, and other symptoms after 30 minutes" and levels that "can cause death and loss of

7

consciousness" within several minutes. App. 1110; Story R. Doc. 30-3, at 24. The setbacks, according to Story County Planning and Development Director Amelia Schoeneman, were "the minimum necessary" to protect "public health, safety, and welfare." *Id.* That point was emphasized by Ms. Schoeneman at the Board of Supervisors meeting, where she explained that Ordinance No. 306's purpose was to "regulate . . . hazardous materials pipelines that pose . . . health and safety risks." App. 1785; Story R. Doc. 55, at 4 (citing Audio of Story Cnty. Bd. of Supervisors Meeting at 53:25 (Oct. 18, 2022)).[6]

Less than a month after the ordinance was passed, William Couser—a farmer who lives in Story County—and Summit filed a complaint in the United States District Court for the Southern District of Iowa, alleging that both federal and state law preempted the ordinance's provisions. App. 977; Story R. Doc. 1. Under the federal Pipeline Safety Act, state and local governments are expressly prohibited from enacting or enforcing safety regulations on interstate pipelines. App. 989; Story R. Doc. 1, at 13. And under Iowa law, the remaining

---

[6] Audio of Story Cnty. Bd. of Supervisors Meeting at 53:25 (Oct. 18, 2022), available at https://www.storycountyiowa.gov/Archive.aspx? AMID=54 (incorporated into Story R. Doc. 30-2 at 3 (SUMF ¶ 18)).

Appellate Case: 23-3760    Page: 17    Date Filed: 07/02/2024 Entry ID: 5409664

authority to regulate pipelines (i.e., non-safety regulations) belongs exclusively to the Iowa Utilities Board. App. 990–91; Story R. Doc. 1, at 14–15.

After Couser and Summit filed suit, the Story County Board of Supervisors retained counsel and enacted a new ordinance, No. 311, which struck most of the provisions from Ordinance No. 306 and replaced them with provisions that had nearly the identical effect. App. 1088; Story R. Doc. 30-3. This time around, though, the staff and County Supervisors rebranded. At the Board of Supervisors meeting, the planning and development director, Ms. Schoeneman, declared "this is about orderly development of land. It doesn't have to do with safety." App. 1789; Story R. Doc. 55, at 8; Add. 55.

Ms. Schoeneman then went on to discuss the substance of Ordinance No. 311, which requires pipeline companies to submit a "an emergency response or preparedness plan" to the County that would "assist with the County's emergency response planning." App. 1095; Story R. Doc. 30-3, at 9 (Ordinance No. 311 § 86.16.1.C). The ordinance— which, according to Ms. Schoeneman, "doesn't have to do with safety"— provides that the emergency plan may be a "preliminary or draft version"

that would "meet the requirements of the federal Pipeline and Hazardous Materials Safety Administration"—the agency whose sole job is to focus on pipeline *safety*. *Id.* It also states that the "County will determine whether the information [in the emergency plan] is sufficient." *Id.*

Like the previous ordinance, Ordinance No. 311 contains extensive setback requirements, prohibiting any hazardous liquid pipeline from coming within a one-quarter mile (1,320 feet) of retirement and nursing homes, childcare centers, group homes, detention facilities, and any dwelling, regardless of whether it is in an urban or rural area. App. 1094; Story R. Doc. 30-3, at 8 (Ordinance No. 311 § 86.16.1.A).

Finally, Ordinance No. 311 provides that the construction of a pipeline in a "critical nature resource" area is only permitted with "trenchless construction methods," and that *no* pipeline construction can commence in Story County until "all required federal, state, and local permits and any private easements or other land use permissions" are obtained. App. 1094–95; Story R. Doc. 30-3, at 8–9.

In response to Ordinance No. 311, and because it was unclear the extent to which Story County had left in place any provisions of Ordinance No. 306 or would otherwise revive it later if Ordinance No. 311

10

were declared invalid, Couser and Summit amended their complaint to challenge both ordinances. App. 1022; Story R. Doc. 28. Following cross motions for summary judgment, the district court ruled in Couser and Summit's favor. The court enjoined the County from enforcing Ordinance No. 306 and Ordinance No. 311. App. 1782; Story R. Doc. 55; Add. 48. Story County represented to the court that Ordinance No. 306 had been completely "repealed and replaced," but given the County's "concession that the challenged provisions of Ordinance No. 306 are preempted anyway," the district court included the ordinance's provisions within the scope of the injunction. App. 1798–99, 1816; Story R. Doc. 55, at 17–18, 35; Add. 64–65, 82.

As for Ordinance No. 311, even though Story County insisted—after being sued for preemption under the Pipeline Safety Act—that its provisions were "not about safety," the district court ruled that emergency management planning requirements and the setback rules were indeed "safety standards" under federal law and therefore preempted. App. 1799, 1812–14; Story R. Doc. 55, at 18, 31–33; Add. 65, 78–80.

Even if the setbacks were not safety-focused or otherwise not preempted by federal law, the district court ruled that they were still preempted under state law because they could prohibit the pipeline from being built in the route that the Iowa Utilities Board might (and ultimately did) expressly permit. App. 1803–04; Story R. Doc. 55, at 22–23; Add. 69–70. That, the district court wrote, "renders [the] local law irreconcilable with state law and thus unenforceable under preemption." App. 1807; Story R. Doc. 55, at 26; Add. 73. For the same reason, the district court ruled that Ordinance No. 311's trenchless construction requirement and the authorization requirement are also preempted by state law. App. 1806–08; Story R. Doc. 55, at 25–27; Add. 72–74.

### Shelby County

On November 1, 2022—over ten months after Summit filed its Utilities Board application—the Shelby County Board of Supervisors passed Ordinance No. 2022-4. App. 245; Shelby R. Doc. 58-3. Like the Story County ordinances, Ordinance No. 2022-4 imposes several requirements for the construction and operation of hazardous liquid pipelines beyond those imposed by the state regulations enacted under

Iowa Code Chapter 479B and federal regulations enacted under the Pipeline Safety Act and its predecessors. App. 245; Shelby R. Doc. 58-3.

Ordinance No. 2022-4—which calls out Summit by name—contains a long preamble that focuses on the safety risk associated with $CO_2$ pipelines, stating that "there are several factors that would influence human safety in the event of a rupture of such pipeline" and that such an incident "may lead to asphyxiation of nearby people." App. 247; Shelby R. Doc. 58-3, at 4. The ordinance goes on to discuss the rupture of a $CO_2$ pipeline in February 2022 in Satartia, Mississippi, and states that PHMSA has initiated rulemaking "to update safety and emergency preparedness" in response to that incident. App. 247–48; Shelby R. Doc. 58-3, at 4–5. The ordinance then states, in one of its many "whereas" clauses, that PHMSA's new rulemaking "is not yet complete," suggesting that the County must step in and fill the gap. App. 248; Shelby R. Doc. 58-3, at 5.

With that context, and because the County Board of Supervisors believes that the "use of land for purposes of transporting Hazardous Liquids through Pipelines poses a threat to the public health and welfare," the ordinance dictates that pipelines keep a "minimum

13

separation distance" of: (1) two miles from any incorporated city; (2) one-half mile from churches, schools, nursing homes, and hospitals; (3) one-quarter mile from parks; and (4) 1,000 feet from any "occupied structure," electric power facility, public drinking water treatment plant, or public wastewater treatment plant. App. 254; Shelby R. Doc. 58-3, at 11 (Ordinance No. 2022-4 § 8.4).

Ordinance No. 2022-4 also requires that pipeline companies create an extensive emergency response and hazard mitigation plan that is consistent with PHMSA regulations if "PHMSA has adopted regulations specifically related to emergency preparedness, emergency response, and hazard mitigation for Carbon Dioxide Pipelines." App. 257; Shelby R. Doc. 58-3, at 14 (Ordinance No. 2022-4 § 8.11). If PHMSA has not adopted any such regulations, the ordinance dictates the details of what must be included in an emergency response plan. *Id.*

The ordinance also creates a comprehensive county-permitting-and-public-hearing process that requires landowners and pipeline companies to apply for and receive conditional use permits from the County to construct a pipeline or to enter into a voluntary easement with landowners for potential use for a pipeline. The fee structure for those

14

permits requires a pipeline company to pay "$100 for each Affected Person identified in the [conditional use] application" and requires landowners to pay $50. App. 254–56; Shelby R. Doc. 58-3, at 11–13 (Ordinance No. 2022-4 §§ 8.5, 8.6, 8.7, 8.8). Under the ordinance, landowners cannot enter into voluntary easements with a pipeline company unless they first receive a permit from the County to do so. App. 255; Shelby R. Doc. 58-3, at 12 (Ordinance No. 2022-4 § 8.6).

Finally, Ordinance No. 2022-4 contains detailed requirements concerning any abandonment of the pipeline and notification requirements regarding the same. App. 259; Shelby R. Doc. 58-3, at 16 (Ordinance No. 2022-4 § 8.12).

Because federal or state law preempts each of those provisions, and because they interfere with Summit's ability to construct the portion of the pipeline crossing Shelby County and conflict with the route that Summit submitted to the Utilities Board for approval, Couser and Summit filed suit against Shelby County on November 15, 2022, asking the court to enjoin enforcement of the ordinance. App. 11–12; Shelby R. Doc. 1, at 1–2.

In early 2023, while the litigation was pending, Shelby County began enforcing the ordinance. The County sent letters to landowners who executed easements with Summit, threatening fines and judicial action to dissolve the easements. App. 81–82, 93–94, 112–14; Shelby R. Doc. 26-3, at 2–3, 14–17, 32–34. Couser and Summit moved to preliminarily enjoin the County from continuing to enforce Ordinance No. 2022-4. The district court granted the request, ruling that Summit was likely to succeed on the merits of its preemption claims.[7] App. 203–39; Shelby R. Doc. 51; Add. 3–39.

The parties then filed cross motions for summary judgment. On December 4, 2023—the same day the court issued its ruling in the Story County case—the court granted summary judgment in favor of Summit and against Shelby County. App. 966–73; Shelby R. Doc. 82; Add. 40–47.

In large part, the district court adopted its preliminary injunction ruling, which focused on state preemption. App. 970; Shelby R. Doc. 82,

---

[7] The district court also ruled that Couser lacked standing because he did not live in Shelby County. App. 220; Shelby R. Doc. 51, at 18; Add. 20. Couser has not appealed his dismissal from the Shelby County case, but he remains a party to and appellee in the Story County case. For simplicity, we will use "Summit" to refer to both appellees since their arguments in support of affirmance are the same.

16

at 5; Add. 44. It also ruled that the ordinance's emergency response requirements and abandonment provisions were safety standards that are preempted by the Pipeline Safety Act. App. 970–72; Shelby R. Doc. 82, at 5–7; Add. 44–46.

Both Story County and Shelby County timely appealed, and the cases were consolidated upon the Counties' joint request.

## SUMMARY OF THE ARGUMENT

The Pipeline Safety Act provides that a "State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c). That language is plain and sweeping: "Congress intended to preclude states from regulating *in any manner whatsoever* with respect to the safety of interstate transmission facilities." *ANR Pipeline Co. v. Iowa State Com. Comm'n*, 828 F.2d 465, 470 (8th Cir. 1987) (emphasis added). The Counties' ordinances set standards that are, clearly, based on safety. The district court correctly ruled that they are preempted under federal law.

If there is any operative provision of the ordinances that is not already preempted by federal law, it is preempted by state law. In Iowa,

Appellate Case: 23-3760    Page: 26    Date Filed: 07/02/2024 Entry ID: 5409664

the Utilities Board is *the* siting authority for pipelines—it decides whether to grant a permit and, in so doing, dictates the precise route and standards under which that pipeline may be constructed and operated. Under these circumstances, where Iowa law "has conditioned pursuit of an activity upon compliance with certain requirements" and the granting of a permit, "[a]ny attempt by a local government to add to those requirements would conflict with the state law, because the local law would in effect prohibit what the state law permits." *Goodell v. Humboldt County*, 575 N.W.2d 486, 501 (Iowa 1998).

That is the case here. The ordinances could (and, in Summit's case, will) forbid the construction and operation of a pipeline that the Utilities Board has expressly permitted. For that reason, the ordinances give way to and are preempted by the Iowa law and the authority granted to the Utilities Board.

## STANDARD OF REVIEW

This Court reviews a "grant of summary judgment de novo and may affirm the judgment of the district court on any basis supported by the record." *Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 610–11 (8th Cir. 2014).

18

<u>**ARGUMENT**</u>

The district court correctly ruled that federal law preempts the ordinances' safety-focused regulations and that Iowa Code Chapter 479B preempts the other provisions, to the extent not already federally preempted.

## I.   THE FEDERAL PIPELINE SAFETY ACT PREEMPTS THE COUNTIES' ORDINANCES.

### A.   Federal law, as this Court has repeatedly held, precludes state decision-making in the area of pipeline safety "altogether."

Congress enacted the Pipeline Safety Act (PSA) in 1994 to combine, recodify, "and enact *without substantive change*" the Natural Gas Pipeline Safety Act of 1968 and the Hazardous Liquids Pipeline Safety Act of 1979. Pub. L. No. 103-272, 108 Stat. 745, preamble (emphasis added). The PSA's purpose "is to provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and enforcement authority of the Secretary of Transportation," which oversees PHMSA. 49 U.S.C. § 60102(a)(1).

To that end, the PSA directs the DOT Secretary to create "minimum safety standards for pipeline transportation and for pipeline facilities"

19

(*id.* § 60102(a)(2)) and makes clear that the federal government is not just *a* regulator of interstate pipeline safety; it is *the* regulator. Under the PSA, a "State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." *Id.* § 60104(c). That express Congressional statement of federal preemption was also included in the Natural Gas Pipeline Safety Act and the Hazardous Liquids Pipeline Safety Act.[8] And when Congress combined those two acts into the PSA in 1994, the leading cases interpreting the preemption provision were from the Eighth Circuit.

In *ANR Pipeline*, this Court—after reviewing the text and history of federal pipeline safety legislation—stated it is "clear that Congress intended to preclude states from regulating *in any manner whatsoever* with respect to the safety of interstate transmission facilities." 828 F.2d at 470 (emphasis added). Like the Counties in this case, the Iowa

_____

[8] Natural Gas Pipeline Safety Act, 49 U.S.C. § 1672(a)(1) (1993) ("No state agency may adopt or continue in force any such standards applicable to interstate transmission facilities, after the Federal minimum standards become effective."); Hazardous Liquids Pipeline Safety Act, 49 U.S.C. § 2002(d) (1993) ("No State agency may adopt or continue in force any safety standards applicable to interstate pipeline facilities or the transportation of hazardous liquids associated with such facilities.").

20

regulator in *ANR* expressed the belief that states have a strong interest in the regulation of pipeline safety. But, as this Court explained, Congress was well aware of that argument and preempted state and local law anyway. *Id.* at 468–69.

"The House report on the bill specifically addresses the argument," this Court wrote, and "Congress's intent regarding the preemption of state authority" was "explicit and unqualified." *Id.* at 468–69. Specifically, the House committee report stated that the "'committee in nowise accepts the declaration that gas safety matters are primarily of local concern and subject to regulation by the States.'" *Id.* at 469 (quoting H.R. Rep. No. 1390, 90th Cong., 2d Sess. (1968)). "'On the contrary,'" the report continued, "'it is the Federal safety standards which are in effect and the ultimate responsibility for establishment and enforcement of the Federal safety standards is the responsibility of the Secretary.'" *Id.*

With that in mind, this Court held that federal law preempted a significant portion of Iowa's regulatory scheme because it focused on safety. *Id.* at 470. Federal law, this Court held, "leaves nothing to the states in terms of substantive safety regulation of interstate pipelines,

regardless of whether the local regulation is more restrictive, less restrictive, or identical to the federal standards." *Id.*

Six years later, in *Kinley Corp. v. Iowa Utilities Board*, the same Iowa regulator was back before this Court, this time under the Hazardous Liquid Pipeline Safety Act, which contained virtually identical preemption language. 999 F.2d 354, 358 (8th Cir. 1993). The now-named Iowa Utilities Board had denied a company's permit application for an existing pipeline and ordered that the pipeline cease operation. The pipeline company argued that the denial was based on safety reasons and therefore preempted. The Utilities Board, though, claimed that its decision to deny the permit was not safety-focused but instead based on the "non-safety provisions [of Iowa Code Chapter 479], specifically the financial responsibility provisions designed to protect the state's farmland and topsoil from damage due to construction, operation, and maintenance of pipelines." *Id.* at 357.

This Court agreed with the pipeline company. In denying the permit, the Utilities Board sent a letter to the pipeline company, which "stated that 'although state safety authority has been impacted by federal legislation, we maintain a strong interest in the safety and integrity of

22

the pipelines operating in Iowa.'" *Id.* at 359. In other words, safety was a driving factor, and this Court correctly saw through the 'financial responsibility' argument as a pretext, so the Utilities Board's actions were preempted. Emphasizing what it had said in *ANR*, this Court explained that "Congress granted exclusive authority to regulate the safety of construction and operation of interstate hazardous liquid pipelines to the Secretary of the Department of Transportation," and this "exclusive federal regulatory authority precludes state decision-making in this area altogether and leaves no regulatory room for the state to either establish its own safety standards or supplement the federal safety standards." *Id.*

This case is no different than *ANR* and *Kinley*. Story County and Shelby County are doing what this Court has already told the Iowa Utilities Board it may not do—regulate the safety of hazardous liquid pipelines. That is the exclusive prerogative of the DOT Secretary, who acts in this arena through PHMSA. The Counties are frustrated that PHMSA has not yet amended its regulations concerning $CO_2$ pipelines, as they (wrongly) believe $CO_2$ pipelines are somehow more dangerous than pipelines that carry combustible liquid. But even if their fears were

23

warranted, the PSA does not allow counties to fill a "gap in the federal regulatory scheme." *Kinley*, 999 F.2d at 359. "A federal decision to forego regulation in a given area may imply an authoritative federal determination that the area is best left unregulated, and in that event would have as much pre-emptive force as a decision to regulate." *Id.* (quoting *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 384 (1983)).

Even so, PHMSA's existing regulations *already* apply to $CO_2$ pipelines. $CO_2$ is treated as a "hazardous liquid" under the PSA, so PHMSA's regulations of hazardous liquid pipelines, 49 C.F.R. Part 195, apply to Summit. 49 U.S.C. § 60101(a)(4). Moreover, the PSA specifically provides that the DOT "shall regulate carbon dioxide transported by a hazardous liquid pipeline facility" and "shall prescribe standards related to hazardous liquid to ensure the safe transportation of carbon dioxide by such a facility." 49 U.S.C. § 60102(i)(1).[9] If the Counties believe that

---

[9] *See also Exxon Corp. v. U.S. Sec'y of Transp.*, 978 F. Supp. 946, 950 (E.D. Wash. 1997) (the Pipeline Safety Act authorizes the Department of Transportation to prescribe standards as to "all aspects of any pipeline transportation in or affecting interstate commerce"); 49 C.F.R. § 195, App. A ("The [Act] leaves to exclusive Federal regulation and enforcement the 'interstate pipeline facilities,' those used for the pipeline transportation of hazardous liquids in interstate or foreign commerce.").

Appellate Case: 23-3760     Page: 33     Date Filed: 07/02/2024 Entry ID: 5409664

greater regulation of $CO_2$ pipeline safety is needed, their recourse is with PHMSA because federal law preempts "decision-making in this area altogether and leaves no regulatory room for the state [or local governments] to either establish its own safety standards or supplement the federal safety standards." *Kinley*, 999 F.2d at 359.

The Counties and their amici urge this Court to ignore *ANR* and *Kinley* in one form or another, with the Iowa Farm Bureau Federation going so far as to say that that the precedents are "inapplicable" because they interpreted the Natural Gas Pipeline Safety Act and the Hazardous Liquids Pipeline Safety Act and because Iowa law has changed since the 1990s. But this Court's opinions on a federal law's preemptive scope do not become "inapplicable" because the challenged state law is different. And as noted above, in passing the PSA, Congress explained that it was merely combining and recodifying the Natural Gas Pipeline Safety Act and the Hazardous Liquids Pipeline Safety Act "*without substantive change.*" Pub. L. No. 103-272, 108 Stat. 745, preamble (emphasis added).

So *ANR* and *Kinley*'s preemption analysis is as applicable to the PSA as it was the PSA's predecessors. In fact, because Congress re-enacted the preemption provision without substantive change *after*

25

*ANR* and *Kinley* were decided—and because they were two of only a handful of cases to analyze the preemptive scope of the federal pipeline safety laws—their precedential value is even stronger. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change" or "adopts a new law incorporating sections of a prior law." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978).

The Counties make several arguments about why specific provisions of their ordinances are not preempted, and we address those below. But under *ANR* and *Kinley*, the analysis starts from the threshold principle that "Congress intended to preclude states from regulating in any manner whatsoever with respect to the safety of interstate transmission facilities." *ANR Pipeline*, 828 F.2d at 470.

## B. The ordinances' requirements that pipelines keep a "minimum distance" from certain structures and public areas are preempted safety standards.

Both Counties' ordinances set standards for the minimal distance a pipeline must be from certain structures and public areas, and both do so based on safety concerns. The Counties do not dispute that in their brief, nor could they; it is obvious from the face the ordinances and the context

26

in which they were enacted. Even the Farmers Union and landowner amici who support the Counties admit the ordinances "established safety-based setbacks for new pipelines." Farmers Union Br. at 3.

Story County started down this path solely out of concern for pipeline safety. The County's first ordinance, No. 306, focused only on setbacks because there are "risks in the event of a spill or rupture." App. 1107; Story R. Doc. 30-3, at 21. The setbacks for a six-inch pipe were set at 1,673 feet based on the potential danger of specific $CO_2$ concentration levels and "evacuation challenges" for hospitals and nursing homes. App. 1105, 1111; Story R. Doc. 30-3, at 19, 25.

Once Summit filed its lawsuit—which highlighted the safety-focus of the ordinance—Story County retained its current outside counsel, passed a new ordinance (with a nearly identical setback), and said that it "doesn't have to do with safety." App. 1789; Story R. Doc. 55, at 8; Add. 55. The district court called that rebranding effort "unconvincing"[10] (and it is[11]), but there is no need to peer into the minds of the Supervisors to

---

[10] App. 1799; Story R. Doc. 55, at 18; Add. 65.

[11] *See English v. Gen. Elec. Co.*, 496 U.S. 72, 84 (1990) (explaining that a state law's purpose is relevant in determining whether the law is preempted).

27

be certain. The safety focus is apparent from the history of Story County's attempt to regulate $CO_2$ pipelines, the face of Ordinance No. 311 (the new ordinance), and the lack of any non-safety rationale offered by Story County.

The setback distance of one-quarter mile in Ordinance No. 311 applies not only to economic-development areas; it applies to every dwelling, even if those that are miles from any municipality or commercial area. App. 1094; Story R. Doc. 30-3, at 8. The setback provision also specifically references, and applies to, nursing homes, childcare centers, hospitals and houses of worship—regardless of whether they are in an economic-development area or along a remote country road. *Id.* The only justification for establishing a setback from these structures, regardless of where they are located, is safety.

The same is true of Shelby County's setbacks: They are, as the Farmers Union admits, "safety based." Among other things, Ordinance No. 2022-4 references "factors that would influence human safety in the event of a rupture" of a $CO_2$ pipeline, it discusses the Shelby County Public Health Position Statement that "expresses concern for the risk of CO2 exposure to humans," and it goes out of its way to highlight the $CO_2$

28

pipeline rupture in Satartia, Mississippi that (according to Shelby County) motivated PHMSA—the agency in charge of pipeline *safety*—to begin a new rulemaking for $CO_2$ pipelines. App. 247–48; Shelby R. Doc. 58-3, at 4–5.

The setback provision itself, section 8.4, states that "transporting Hazardous Liquids through Pipelines poses a threat to the public health and welfare," and it provides that a pipeline must be further from structures with vulnerable populations, like nursing homes and schools, than it does other dwellings. App. 253–54; Shelby R. Doc. 58-3, at 10–11. Safety is the point, so the PSA preempts the setback standards.

The Counties argue that the setbacks are saved because they affect the pipeline's location, and the PSA provides that it "does not authorize the Secretary of Transportation to prescribe the location or routing of a pipeline facility." 49 U.S.C. § 60104(e). But the Counties misunderstand that provision and its relation to safety preemption. It does not, contrary to their argument, preclude PHMSA from establishing safety standards that might affect a pipeline's location. Nor does it give state and local

29

authorities the ability to establish safety standards, so long as those standards affect where a pipeline cannot be buried underground.[12]

Instead, section 60104(e) merely makes clear that PHMSA is not the siting authority for *any* pipeline, whether it carries natural gas, crude oil, $CO_2$, or any other hazardous liquid. That siting authority—of approving a *specific* route and granting permits of convenience and necessity—is left to the Federal Energy Regulatory Commission (FERC) for natural gas pipelines and to the states for hazardous liquid pipelines. That understanding is borne out by the history of federal pipeline regulation, the text of the PSA itself, and the very cases that the Counties rely on.

The Natural Gas Pipeline Safety Act of 1968, which was the first of the two acts that Congress combined into the PSA without substantive change, had the same "location or routing" language, though it was

---

[12] Although the Counties argue that they are free to establish safety-based setbacks because PHMSA is precluded from establishing any standards that effect location, they do not actually believe that. In their brief, Story County admits that the setbacks in Ordinance No. 306 "intruded on the Secretary of Transportation's exclusive authority under the PSA to establish 'safety standards' for the design and construction of hazardous liquid pipelines." Br. at 20.

included in the definition of "pipeline facility." The relevant provision of the 1968 Act stated in full:

> "Pipeline facilities" includes, without limitation, new and existing pipe rights-of-way and any equipment facility, or building used in the transportation of gas or the treatment of gas during the course of transportation but "rights-of-way" as used in this chapter does not authorize the Secretary to prescribe the location or routing of any pipeline facility.

Pub. L. No. 90–481, 82 Stat. 1003 (formerly 49 U.S.C. § 1671(4)). In its amicus brief, the Pipeline Safety Trust acknowledges that this language—which was also included in the Hazardous Liquid Pipeline Safety Act of 1979—did not preclude the DOT from enacting safety regulations that affect where a pipeline cannot go. Pipeline Safety Tr. Br. at 9–10. The Pipeline Safety Trust therefore concedes that the "location and routing" language did not limit the preemptive effect of those two pipeline safety acts.

That is a concession the Pipeline Safety Trust must make because almost immediately after the passage of the Natural Gas Pipeline Safety Act, the DOT promulgated a regulation that provides "[p]ipeline right-of-way must be selected to avoid, as far as practicable, areas containing private dwellings, industrial buildings, and places of public assembly."

31

34 Fed. Reg. 15473, 15475 (Oct. 4, 1969). In other words, the DOT immediately created a safety standard that affects location. That regulation was re-promulgated in 1981 to reflect the passage of "the Hazardous Liquid Pipeline Safety Act of 1979" (46 Fed. Reg. 38357, 38366 (July 27, 1981)), was in in force when Congress passed the PSA, and remains in force today. 49 C.F.R. § 195.210.

That is a problem for the Counties' argument. They know it, so they hit the nuclear button: They ask this Court to declare 49 C.F.R. § 195.210 and any other safety regulation that affects location "ultra vires and invalid." Br. at 52. But the PSA's language does not require that result, and Congress is presumed to know that 49 C.F.R. § 195.210 existed when it recodified the pipeline safety laws in the PSA. *See Lorillard*, 434 U.S. at 580. Yet Congress made clear that it was making no substantive changes to this area of law.

The Counties' argument—that the DOT Secretary has no authority to issue safety standards that affect location—is also inconsistent with the PSA itself. In 1979, Congress amended the Natural Gas Pipeline Safety Act to require the DOT Secretary to issue "safety standards for determining the location of any new [liquified natural gas] facility." Pub.

32

L. No. 96-129, 93 Stat. 989, 999. Congress included that provision in the PSA (49 U.S.C. § 60103(a)) and, at the same time, provided that the PSA did "not authorize the Secretary of Transportation to prescribe the location or routing of a pipeline facility" (49 U.S.C. § 60104(e), which includes liquefied natural gas pipelines (*see id.* § 60101(a)(18)).

If the Counties were correct—if the "location and routing" provision precludes the Secretary from enacting any safety regulations that affect pipeline location—then one provision of the PSA would direct the DOT Secretary to do what another provision expressly forbids. That cannot be. Instead, the two statutes can easily be harmonized. By stating that the DOT Secretary cannot dictate "location and routing," the PSA is merely carrying forward a policy, which has existed since 1968, that the DOT is not in charge of siting pipelines—i.e., it is not the authority to approve the pipeline's precise path. That is FERC's prerogative for natural gas pipelines and the states' prerogative for hazardous liquid pipelines. (In Iowa, as discussed below, that is the Iowa Utilities Board.) For this Court to rule otherwise, it would indeed need to declare—as the Counties claim—that 49 C.F.R. § 195.210(a) is *ultra vires*. Given the long history

33

of that regulation and Congress's subsequent recodification of pipeline safety law, that is more than a stretch.

The Counties also claim that the Fifth Circuit's decision in *Texas Midstream Gas Services LLC v. City of Grand Prairie*, 608 F.3d 200 (5th Cir. 2010), supports their theory that a setback cannot be a safety standard that is preempted under the PSA. But that decision actually suggests the opposite. Upon the announcement that Texas Midstream was going to construct an above-ground natural gas compressor station within its city limits, the City of Grand Prairie enacted a zoning ordinance that required compressor stations comply with certain setbacks, be surrounded by a security fence, and maintain certain "aesthetic standards." *Id.* at 203. The district court ruled that the PSA preempted the security-fence requirement as a safety regulation, but not the setback and aesthetic standards. The Fifth Circuit agreed. *Id.* at 205.

The setback requirement was not a "safety standard," the Fifth Circuit held, because it was not created out of safety concerns. The city's records showed that the "primary motivation" in adopting the ordinance "was to preserve neighborhood visual cohesion" and "avoiding eyesores," and thus the setback "primarily ensure[d] that bulky, unsightly, noisy

34

compressor stations do not mar neighborhood aesthetics." *Id.* at 211. The Fifth Circuit's focus on the non-safety purpose of the setback supports only the fact that safety-based setbacks *are* safety standards preempted by PSA. Notably, the Fifth Circuit cited favorably to this Court's decision in *ANR* for the proposition that courts "uniformly invalidate[] parochial safety provisions"—which the ordinances in this case clearly are. *Id.*

The Counties also rely on *Washington Gas Light Co. v. Prince George's County Council*, 711 F.3d 412 (4th Cir. 2013), but that case too supports Summit's position. There, the county enacted a zoning ordinance that prohibited all industrial usage in an area where Washington Gas desired to build an above-ground liquified natural gas storage tank. *Id.* at 414–15. Like the Fifth Circuit in *Texas Midstream*, the Fourth Circuit did not rule that a zoning provision *cannot be* a safety standard. Instead, it concluded that the "main purpose" of the zoning ordinance was not safety related; it was a typical land-use regulation "designed to foster transit-oriented development around the West Hyattsville Metro Station." *Id.* at 421. "Even assuming safety concerns played some part" in the ordinance, the court concluded that safety was at most "merely incidental" to the non-safety purpose and thus

35

"insufficient to justify" the conclusion that the zoning plans "were, in fact, safety regulations." *Id.* at 422.

The implication of the Fourth Circuit's analysis in *Washington Gas*, like the Fifth Circuit's analysis in *Texas Midstream*, is that the court *would have* ruled that the ordinance was preempted if it was indeed based on safety. Here, safety *is* the primary driver, which means that, under *Kinley* and the PSA's express terms, the ordinances are preempted. Indeed, regardless of whether a regulation is based solely or only in part on safety, this Court's binding precedent is clear: States and municipalities are precluded from regulating the safety of pipelines "in any manner whatsoever." *ANR Pipeline*, 828 F.2d at 470; *see also Kinley*, 999 F.2d at 358–59 (embracing *ANR Pipeline*'s reasoning).

The Counties also claim that a recent letter from PHMSA's Associate Administrator for Safety Alan Mayberry supports their position that local governments can regulate the safety of hazardous liquid pipelines through zoning. Again, the opposite is true. For the most part, the letter simply parrots the language of the PSA, noting that PHMSA cannot "prescribe the location or routing of a pipeline" and that, as the courts in *Texas Midstream* and *Washington Gas* held, local

36

governments can exercise their land-use powers "*so long as* officials do not attempt to regulate the field of pipeline safety." App. 916; Shelby R. Doc. 78-1, at 18 (emphasis added). Indeed, the letter was clear on the fundamental issue in this case, confirming that "Federal preemption of pipeline safety means that states [or local governments] do not have any independent authority to regulate pipeline safety." *Id.*

The letter goes on to list ways in which local governments have enacted ordinances that "contribute in many ways to the safety of their citizens," but that list is notable for the categories of regulations that are, *and are not*, included. None of the eight examples regulate pipelines; instead, they are all directed at development or activity near existing pipelines. The letter discusses local land use authority in terms of how local governments can "regulate land use . . . *and property development . . . in the vicinity* of pipelines." App. 916; Shelby R. Doc. 78-1, at 18 (emphasis added). In other words, local governments can prohibit housing from being built within a certain distance from a pipeline, *even if* they are doing so for safety reasons, but they cannot set safety standards for how far new pipelines must be from housing developments. That distinction comes directly from the PSA, which

applies only to "safety standards" for "the owners and operators of pipeline facilities." 49 U.S.C. § 60102(a)(2)(A). Nowhere in the letter does PHMSA express the position that a county can enact a pipeline setback for safety reasons—because it cannot.

The PSA is, as the district court put it, "a sweeping exercise of express preemption." App. 216; Shelby R. Doc. 51, at 14; Add. 16 (citing *Kinley*, 999 F.2d at 359). "A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c). The setbacks are undeniably standards, they are based on safety, so they are preempted.

## C. The emergency response and abandonment provisions are preempted safety standards.

Requiring pipeline companies to submit an emergency-response plan is a safety standard. If that were not apparent enough, PHMSA's rules make it clear. For example, 49 C.F.R. § 195.402(e) requires hazardous liquid pipelines to prepare and follow a manual that includes procedures for "when an emergency condition occurs," including "[r]eceiving, identifying, and classifying notices of events that need immediate response," "[h]aving personnel, equipment, instruments, tools, and material available as needed at the scene of an emergency,"

and "assisting with evacuation of residents." The following section, 49 C.F.R. § 195.403, contains training requirements for emergency response.

The Counties claim they are requiring only that Summit share information about emergency response. That is not true. And in any event, requiring the disclosure of information the Counties deem (in their discretion) relevant to emergency response places affirmative safety-related obligations on the pipeline companies. To be sure, the Counties are not precluded from creating their own emergency management plans. But under the PSA, they cannot commandeer the pipeline companies to do so. *See Nat. Gas Pipeline Co. of Am. v. R.R. Comm'n*, 679 F.2d 51, 52 (5th Cir. 1982) (holding that the NGPSA preempted a Texas Railroad Commission rule requiring natural gas companies "to provide specified procedures and safeguards to warn and protect the general public against [an] accidental release").

Shelby County's ordinance requires pipeline companies to submit an "emergency response and hazard mitigation plan" meeting various standards. App. 76; Shelby R. Doc. 26-2, at 14. Among other things, the plan must describe how the pipeline company intends to work with local

39

law enforcement, emergency management personnel, and first responders in the event of an emergency. *See* App. 71–74; Shelby R. Doc. 26-2, at 14–17 (Ordinance No. 2022-4 §§ 8.111, 8.112). That is a safety standard—and one that is expressly required and regulated by PHMSA. *See* 49 C.F.R. §§ 195.402(e), .403.

Story County's is more general, but it still requires that Summit submit a plan "that would meet the requirements of [PHMSA]"—which itself is an admission that the provision is a safety standard. App. 1070; Story R. Doc. 28-3, at 8. Also, under Ordinance No. 311, Story County "will determine whether the information in the plan is sufficient" and, if it is not, the County gets to request whatever additional material it so desires. *Id.* As the district court concluded, that "puts the County in the position to determine whether the information provided in the emergency plan meets its expectations or, in other words, its 'standards.'" App. 1815; Story R. Doc. 55, at 34; Add. 81.

Finally, the abandonment provision adds to PHMSA's abandonment regulations, which state and local governments cannot do. PHMSA already requires pipeline companies to develop procedures regarding facility abandonment, "including safe disconnection from an

40

operating pipeline system, purging of combustibles, and sealing abandoned facilities left in place to minimize safety and environmental hazards." 49 C.F.R. § 195.402(c)(10). The statute grants authority to the DOT Secretary over those safety concerns, which means that state and local agencies cannot regulate them. *Kinley Corp.*, 999 F.2d at 359.

Shelby County claims that its abandonment provision is fine because it takes effect only after PHMSA loses jurisdiction. But that too is incorrect. Section 8.12 of the Shelby County ordinance begins to take effect even before abandonment, and thus when PHMSA still has exclusive authority. Pipeline companies must notify any "affected persons" of their intent to abandon a pipeline. App. 78; Shelby R. Doc. 26-2, at 16. And to the extent that any other paragraphs of section 8.12 are severable, they are preempted under state law, as discussed below.

## II. IOWA LAW PREEMPTS ANY REMAINING PROVISION OF THE COUNTIES' ORDINANCES THAT FEDERAL LAW DOES NOT PREEMPT.

The Iowa Constitution gives counties "home rule power and authority" to determine their affairs, but only so long as the exercise of that authority is "not inconsistent with the laws of the general assembly." Iowa Const. art. III, § 38A. The Story County and Shelby County

41

ordinances conflict with Iowa Code Chapter 479B and the authority granted to the Iowa Utilities Board so—to the extent not already preempted by federal law—they are preempted by state law.

The Iowa Legislature has delegated to the Utilities Board the authority over pipeline permitting and siting. And not merely *some* authority; it holds "*the* authority to implement certain controls over hazardous liquid pipelines to protect landowners and tenants from environmental or economic damages which may result from the construction, operation, or maintenance of a hazardous liquid pipeline or underground storage facility within the state, [*and*] *to approve the location and route of hazardous liquid pipelines*." Iowa Code § 479B.1 (emphasis added).[13] In other words, the Utilities Board establishes the precise route of the pipeline.

In summarizing the district court's state-preemption ruling, the Counties (correctly) state that the "district court found both Counties' ordinances impliedly preempted because of a 'possibility' that the [Utilities Board] might approve the pipeline, but Summit would be

_____

[13] It is worth noting that the Utilities Board's authority to regulate pipelines applies to environmental and economic concerns, but not safety. That is a result of this Court's decisions in *ANR* and *Kinley*.

42

unable to build it because of the setbacks." Br. at 21. That, according to the Counties, is error "because the requirements for implied preemption are much more demanding." *Id.*

But however demanding those standards might be, they cannot be found in the Counties' brief because the Counties do not discuss—or even cite to—the very case that formed the basis for the district court's ruling: *Goodell v. Humboldt County*. Instead, the Counties go on for pages about the irrelevant claim that there is no preemption problem because had Summit just "worked with them" to find a "mutually agreeable route" that the Utilities Board would also approve, there would be no irreconcilable conflict. But that is not how Iowa conflict preemption works. We know that because *Goodell* tells us so.

In *Goodell*, several livestock producers challenged a county ordinance that regulated livestock confinements. 575 N.W.2d at 489. Although the Iowa Code chapter contained no express preemption provision, the livestock producers argued, among other things, that the permitting ordinance was impliedly preempted because it conflicted with the Iowa Department of Natural Resources' broad power to permit and regulate livestock operations. *Id.* at 502. In other words, the "local law

43

prohibited an act permitted by statute." *Id.* at 501 (cleaned up). The county, on the other hand, argued that it was within its authority to regulate livestock operations because Iowa Code provides that "a local government may 'set standards and requirements which are higher or more stringent than those imposed by state law.'" *Id.* (quoting Iowa Code § 331.301(6)).

The Iowa Supreme Court agreed with the livestock producers. The court recognized that there is some tension between these two "general principles" of Iowa preemption law—that a county can set higher standards but cannot prohibit what the state permits—but it also recognized that there is a distinction. *Id.* at 501. "When a state law merely sets a standard, a local law setting a higher standard would not conflict with the state law and would be authorized under section 331.301(6)." *Id.* But "where the state has conditioned pursuit of an activity upon compliance with certain requirements" and the granting of a permit, then "[a]ny attempt by a local government to add to those requirements would conflict with the state law, because the local law would in effect prohibit what the state law permits." *Id.*

44

The statutory scheme in *Goodell* fell into the second category of this standard/permit distinction. The legislature had "specifically invested" the state agency "with the authority to adopt rules relating to the construction or operation of animal feeding operations, including, but not limited to, minimum manure control requirements, requirements for obtaining permits, and department evaluations of animal feeding operations." *Id.* at 502. And to that end, DNR had created rules for the permitting of construction and operation of certain animal feeding operations. *Id.*

Thus, a conflict arose when the county created an ordinance that "condition[ed] construction and operation of any large confinement operation upon filing an application and obtaining a permit" from the county. *Id.* at 503. "[A]ssume an operation meets state law requirements, but not the county's additional requirements," the court wrote. *Id.* "Under these circumstances, the state rules would allow construction and operation of the facility, but the county ordinance would prohibit it because the operation would not have met the additional requirements of the county's ordinances." *Id.* Thus the ordinance did "not merely impose higher standards on livestock confinement operations by adding the

county permit requirement," but it also "change[d] the state regulatory system" because "the county, not the [Iowa Department of Natural Resources], becomes the decision maker." *Id.*

The same is true here. The Iowa Legislature has delegated to the Utilities Board the responsibility of "examin[ing] the proposed route of the pipeline and location of the underground storage facility" (Iowa Code § 479B.8) and granting permits "in whole or in part upon terms, conditions, and restrictions as to location and route *as it determines to be just and proper* (*id.* § 479B.9 (emphasis added)). That power to set the route is not limited to merely approving or disapproving the route submitted by the applicant; it also includes the authority to *move* the route as it sees fit and to grant a permit to construct a pipeline on conditions and restrictions it finds proper.[14] The Counties' ordinances, on the other hand, contain setbacks and other regulations that could (and,

---

[14] In fact, in its order approving Summit's permit application, the Utilities Board did just that—166 pages of its order are dedicated to a parcel-by-parcel analysis of the route, including requiring specific route modifications. Final Decision & Order at 308–463; *see also id.* at 43 ("[T]he Board will state Iowa Code § 479B.9 allows the Board to determine the location and route of the hazardous liquid pipeline as it deems just and proper. Any county permit that would alter Summit Carbon's location and route, if approved, would conflict with the Board's decision as to the just and proper location and route.").

46

in Summit's case, do) prohibit what the Utilities Board deems just and proper.

Iowa Code Chapter 479B therefore preempts the ordinances. It does not matter whether Summit or any other pipeline company could somehow thread the needle through the Counties' heavily restrictive setbacks, or whether the Counties would grant variances and let the pipeline pass through anyway (and they clearly will not). Because a pipeline company could "meet[] state law requirements, [dictated by the Utilities Board in its permit decision] but not the county's additional requirements"—and thus because state law could "allow construction and operation of the facility, but the county ordinance would prohibit it because the operation would not have met the additional requirements of the county's ordinances"—then under *Goodell* the county laws conflict with (and are preempted by) state law. *Goodell*, 575 N.W.2d at 501.[15]

---

[15] In its resistance to summary judgment, Story County tried to distinguish *Goodell* by claiming that its ordinance is a zoning restriction, whereas the ordinance in *Goodell* was not. Story R. Doc. 39, at 3–4. The zoning/non-zoning issue is discussed at the beginning of the analysis section in *Goodell*, but only because there was a threshold issue of whether the ordinance was expressly preempted by a state law prohibition on zoning agricultural activities. *Goodell*, 575 N.W.2d at 494–97. The Iowa Supreme Court held that the ordinance did not carry the zoning label because it sought to "regulate an activity irrespective of the

47

That rule applies to more than just setbacks; it applies to the entirety of the Counties' regulatory schemes, which contain additional requirements that could prohibit Summit or any other pipeline company from constructing a pipeline within the Counties' borders, even though the pipeline company may hold a permit from the Utilities Board to do so. Shelby County's ordinance contains a detailed permit application and public hearing process, the result of which could be to deny what the Utilities Board approves. Story County Ordinance No. 311 contains a trenchless construction requirement and precludes construction altogether until pipeline companies like Summit "obtain all required federal, state, and local permits and any private easements or other land use permissions prior to commencing construction and submit documentation of such authorizations with the permit application." App. 1070; Story R. Doc. 28-3, at 8 (Ordinance No. 311 § 86.16.1.D). But Iowa

_____

location of that activity within the county." *Id.* at 496. The court therefore went on to determine that ordinance was nevertheless impliedly preempted because it conflicted with Iowa's livestock confinement permitting scheme. In this case, it does not matter whether the Counties' ordinance derives from its zoning authority or general police power. The implied preemption analysis under *Goodell* is the same, though it is also true that the ordinances in this case "regulate an activity irrespective of the location of that activity within the county," and thus would not technically be considered zoning restrictions under Iowa law. *Id.* at 496.

48

Code Chapter 479B governs all aspects of the construction of hazardous liquid pipelines in the state, including when that construction may commence. *See* Iowa Code § 479B.3 ("A pipeline company *shall not construct* . . . a pipeline or underground storage facility . . . except in accordance with this chapter." (emphasis added)).

Shelby County's ordinance also imposes requirements for restoring property after a pipeline project is discontinued. *See* App. 78–79; Shelby R. Doc. 26-2, at 16–17 (Ordinance No. 2022-4 § 8.12). But the Utilities Board is empowered to establish standards for land restoration during and after pipeline construction and has done so through detailed regulations. *See* Iowa Code § 479B.20; 199 Iowa Admin. Code ch. 9.

Iowa law also already establishes a limited role for county boards of supervisors when land restoration is required, which further supports preemption. *See* Iowa Code § 479B.20. In *Goodell*, the Iowa Supreme Court found it relevant that the county's role under the state statutory scheme was already "well-defined," as the county "may comment on the proposed facility's compliance with state law," the "DNR considers the county's comments," but "chapter 455B places the decision-making authority with the DNR." *Goodell*, 575 N.W.2d at 503. Thus, the court

49

concluded that the "ordinance also conflicts with the limited role envisioned by the legislature for the county in the permitting process." *Id.*

Iowa law also prescribes requirements for pipeline removal and abandonment. *See id.* § 479B.32 (reversion on nonuse); *see also id.* § 479B.32(4) ("[T]he landowner may require the pipeline company to remove any pipe or pipeline facility remaining on the property."). The Shelby County ordinance acknowledges those authorities, paying them lip service even as it undermines them. App. 65; Shelby R. Doc. 26-2, at 3–4 (citing to the requirements of Iowa Code § 479B.20); App. 78–79; Shelby R. Doc. 26-2, at 16–17 (Ordinance No. 2022-4 § 8.12) (citing to Iowa Code § 479B.32).

The same is true of the Shelby County's requirement that "[a] Property Owner that intends to negotiate or sell an easement to a Pipeline Company by means of an Independent Agreement" to apply for a conditional use permit from the Shelby County Zoning Administrator *before* executing the easement. App. 72; Shelby R. Doc. 26-2, at 10 (Ordinance No. 2022-4 § 8.32). Iowa law requires pipeline companies to "make a good faith effort to negotiate with the owner to purchase the

50

private property or property interest before filing an application for condemnation or otherwise proceeding with the condemnation process," so the County's prohibition of that practice (without a county permit) conflicts with state law. Iowa Code § 6B.2B; *see also* Iowa Code § 479B.16 ("A pipeline company granted a pipeline permit shall be vested with the right of eminent domain . . . .").

The Counties suggest that Iowa Code Chapter 479B "expressly contemplates the applicability of local zoning ordinances, because an applicant must describe '[t]he relationship of the project to the present and future land use and zoning ordinances.'" Br. at 27 (quoting Iowa Code § 479B.5(7)). But section 479B.5(7) only undermines the Counties' argument, because it requires a permit applicant to inform *the Utilities Board* about existing zoning ordinances. Iowa Code § 479B.5(7). The statute granting the Utilities Board authority over the decision to grant a pipeline permit expressly *permits* the construction of a pipeline even if that construction might violate a county ordinance. Thus, section 479B.5(7) is an informational requirement that helps the Utilities Board understand the nature of current land uses and any known pending changes so it can make an informed decision about whether to grant the

51

proposed route. In other words, it allows the Utilities Board to take county land-use issues into consideration when granting a permit, but neither requires the Utilities Board to follow those local land-use restrictions nor provides counties with any authority over pipeline siting or regulation.

Indeed, the Iowa Legislature understands that counties do not possess the authority that Shelby County claims. Because the Utilities Board's authority under Chapter 479B preempts local ordinances, several legislators—including the Speaker of the Iowa House of Representatives—introduced legislation that would have required the Utilities Board to grant a $CO_2$ pipeline permit *only if* the applicant *first* obtained "local zoning permits." H.F. 368 § 3, 90th Gen. Assemb., Reg. Sess. (Iowa 2023).[16] Under that proposal, the Utilities Board could not have granted a permit "unless the project [were] in compliance with existing zoning ordinances, and the pipeline company ha[d] acquired local zoning permits, where applicable." *Id.* Of course, there would be no need for the Iowa House to have proposed that amendment if Chapter

---

[16] H.F. 368 is available at:
https://www.legis.iowa.gov/docs/publications/LGI/90/HF368.pdf.

Appellate Case: 23-3760     Page: 61     Date Filed: 07/02/2024 Entry ID: 5409664

479B did not already preempt local zoning ordinances. The legislation failed.[17]

Shelby County claims that the ordinance's landowner-permitting requirements are not preempted because the Utilities Board lacks jurisdiction over "voluntary easement agreements" between landowners and pipeline companies. Br. at 39 (citing Iowa Code § 479B.20). Again, the County misses the point. Under Iowa Code § 479B.20, a county board of supervisors can "*petition the [Utilities Board] for an order* requiring corrective action be taken" and "*may file a complaint with the [Utilities Board]* seeking imposition of civil penalties" if the "pipeline company or its contractor does not comply with . . . an independent agreement." Iowa Code § 479B.20(5) (emphasis added). In other words, section 479B.20 confirms that counties may *petition the Utilities Board* regarding the agreements, but the Utilities Board holds the authority to take action pertaining to those agreements.

Although the Counties do not cite the Iowa Supreme Court's decision in *Goodell*, they do rely on an Iowa Court of Appeals' decision

---

[17] The proposed amendment was withdrawn on March 22, 2023. *See* H.J., 90th Gen. Assemb., Reg. Sess. 725 (Iowa 2023).

that tried to distinguish it. In *BeeRite Tire Disposal/Recycling, Inc. v. City of Rhodes*, the Iowa Court of Appeals upheld a local ordinance about tire disposal (despite state regulations surrounding the same) because "tire piles are confined to one area" whereas the "livestock confinement waste" created by the confinements in *Goodell* "flow freely throughout the state" and thus require statewide regulation. 646 N.W.2d 857, 861 (Iowa Ct. App. 2002). But four years later, in *Iowa Grocery Indus. Association v. City of Des Moines*, the Iowa Supreme Court called into question "the validity of the distinction made by the court of appeals in *BeeRite*" and struck down a city ordinance because it "disrupt[ed] the uniformity in the [state] statutory scheme" that reserved for the state "the power to establish beer permits, wine permits, and liquor licenses." 712 N.W.2d 675, 682 (Iowa 2006).

Like the Iowa Supreme Court, we question whether *BeeRite* faithfully applied *Goodell*. And *Goodell* and *Iowa Grocery* are binding on this Court; *BeeRite* is not. *E.g.*, *Allstate Indem. Co. v. Rice*, 755 F.3d 621, 623 (8th Cir. 2014) ("'In interpreting state law, we are bound by the decisions of the state's highest court.'" (citation omitted)). But even if *BeeRite* is good law, the county ordinances here fail the local/statewide

distinction that the Iowa Court of Appeals used to distinguish *Goodell*. *BeeRite*, 646 N.W.2d at 861. Unlike tire-recycling facilities, which are confined to one area, Summit's proposed pipeline will travel through 30 of Iowa's 99 counties. It is, after all, an interstate project, so a county-by-county permitting scheme would "disrupt[] the uniformity in the statutory scheme" under which pipelines are regulated by the Utilities Board. *Iowa Grocery*, 712 N.W.2d at 682.

In short, Iowa Code Chapter 479B leaves no room for local laws that purport to regulate pipeline permitting or siting. And for good reason: The Iowa Legislature could never have intended for major infrastructure projects to face 100 different permitting processes—one state process and separate processes in each of Iowa's 99 counties—with the potential for 100 inconsistent (and sometimes shifting)[18] sets of requirements. That is why the Iowa Supreme Court has consistently preempted county-level

_____

[18] In this case, the ordinances were passed almost a year after Summit submitted its application and proposed route to the Utilities Board. So under the Counties' argument, they have the power to change the law in the middle of a statewide siting process, requiring that the process start over with a new route or that the Utilities Board continue on, with the option of holding a hearing on a pipeline that cannot legally be built. That reading of Iowa Code Chapter 479B is unworkable and would surely kill investment in multi-county linear infrastructure projects.

Appellate Case: 23-3760    Page: 64    Date Filed: 07/02/2024 Entry ID: 5409664

legislation that would erode the authority of the "enforcement scheme established by" the Iowa Legislature. *Goodell*, 575 N.W.2d at 501–02.

## CONCLUSION

Both federal and state law preempt the Counties' ordinances. This Court should affirm the district court's judgments.

Respectfully submitted this 2nd day of July, 2024.

By: _/s/ Ryan G. Koopmans_
Ryan G. Koopmans
**KOOPMANS LAW GROUP P.C.**
500 East Court Avenue, Suite 420
Des Moines, IA 50309
(515) 978-1140
ryan@koopmansgroup.com

Bret A. Dublinske
Brant M. Leonard
Kristy Dahl Rogers
**FREDRIKSON & BYRON, P.A.**
111 East Grand Avenue, Suite 301
Des Moines, IA 50309
(515) 242-8900
bdublinske@fredlaw.com
bleonard@fredlaw.com
krogers@fredlaw.com

Brian D. Boone
Michael R. Hoernlein
**ALSTON & BIRD LLP**
1120 South Tryon Street, Suite 300
Charlotte, NC 28203-6818

(704) 444-1000
brian.boone@alston.com
michael.hoernlein@alston.com

*Attorneys for Plaintiffs-Appellees*
*William Couser and Summit*
*Carbon Solutions, LLC*

# CERTIFICATE OF COMPLIANCE.

1.    This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 11,373 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.

3.    The electronic version of this brief was generated by printing to PDF from the original word processing file in compliance with Eighth Circuit Rule 28A(h)(3). It has been scanned for viruses and is virus-free in compliance with Eighth Circuit Rule 28A(h)(2).

Dated: July 2, 2024

$\phantom{xxxxxxxx}$ */s/ Ryan G. Koopmans* $\phantom{xx}$
Ryan G. Koopmans

58

## CERTIFICATE OF SERVICE

The undersigned certifies the foregoing document was electronically filed with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit using the CM/ECF on July 2, 2024, which will serve a notice of electronic filing to all registered counsel of record.

Dated: July 2, 2024

*/s/ Ryan G. Koopmans*

Ryan G. Koopmans
