# In the United States Court of Appeals
# For the Eighth Circuit

Nos. 23-3758 and 23-3760

WILLIAM COUSER AND SUMMIT CARBON SOLUTIONS, LLC,
*Plaintiffs-Appellees,*

v.

SHELBY COUNTY, IOWA, et al., and STORY COUNTY, IOWA, et al.,
*Defendants-Appellants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF IOWA (Hon. Stephanie M. Rose)

## AMICI CURIAE BRIEF OF AMERICAN PETROLEUM INSTITUTE AND LIQUID ENERGY PIPELINE ASSOCIATION IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

Keith J. Coyle, Esq.
Christina Manfredi McKinley, Esq.
Babst, Calland, Clements & Zomnir, P.C.
505 9th Street, NW, Suite 602
Washington, DC 20004
(202) 853-3460
kcoyle@babstcalland.com
cmckinley@babstcalland.com

*Counsel for Amici Curiae American Petroleum Institute and Liquid Energy Pipeline Association*

Dated: July 8, 2024

# CORPORATE DISCLOSURE STATEMENT

American Petroleum Institute and Liquid Energy Pipeline Association are non-profit trade associations. They have no parent corporations and no publicly held corporation owns any stock in either trade association.

Appellate Case: 23-3760   Page: 2   Date Filed: 07/08/2024 Entry ID: 5410865

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

IDENTITY AND INTEREST OF AMICI CURIAE AND SOURCE
    OF FILING AUTHORITY ........................................................ ix

RULE 29(a)(4)(E) STATEMENT ...................................................... xi

INTRODUCTION ............................................................................... 1

ARGUMENT ....................................................................................... 5

I.    PIPELINES ARE THE SAFEST MEANS OF
    TRANSPORTING ENERGY PRODUCTS. .......................... 5

    A.    Pipelines are Getting Even Safer. ................................. 5

    B.    Pipelines Have a Strong Safety Record Because of the
        Cooperative Efforts of Industry, Regulators, and the
        Public. ............................................................................ 9

II.    PIPELINES ARE A CRITICAL COMPONENT OF THE
    UNITED STATES ECONOMY. ............................................ 12

III.    ALLOWING THE COUNTY ORDINANCES TO STAND
    WOULD HAVE FAR-REACHING RAMIFICATIONS AND
    UNINTENDED CONSEQUENCES. .................................... 18

    A.    The County Setback Requirements are Preempted
        Pipeline Safety Standards, Not Permissible Land Use
        Regulations. ................................................................... 18

    B.    The Prohibition on Actual Location or Routing
        Decisions Does Not Save the Preempted County
        Ordinances. .................................................................... 25

    C.    The Counties' Emergency Response Requirements are
        Also Preempted Safety Standards. ............................... 31

CONCLUSION ................................................................................... 31

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
    LIMIT ........................................................................................

CERTIFICATE OF SERVICE ..........................................................

Appellate Case: 23-3760    Page: 3    Date Filed: 07/08/2024 Entry ID: 5410865

# TABLE OF AUTHORITIES

Page

## Cases

*ANR Pipeline Co. v. Iowa State Commerce Comm'n*,
828 F.2d 465 (8th Cir. 1987) ................................................................. 3

*Corner Post, Inc. v. Board of Governors, Federal Reserve System*,
603 U.S. ____ (2024) ................................................................. 27

*Enbridge Energy Co., Inc., et al. v. Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation*,
Nos. 23-2309, ECF No. 94 (7th Cir. 2024) ........................................ 23

*GPA Midstream v. DOT*,
67 F.4th 1188 (D.C. Cir. 2023) ........................................................ 27

*In re Homeland Energy Sols. LLC, No. P-0907*,
2023 WL 5512020 (Aug. 24, 2023) .................................................... 26

*Kinley Corp. v. Iowa Utilities Bd.*,
999 F.2d 354 (8th Cir. 1993) ................................................................. 3

*Larson v. Sinclair Transp. Co.*,
2012 CO 36, 284 P.3d 42 (Co. 2012) (en banc) .................................... 1

*Northern Nat. Gas Co. v. Iowa Utilities Bd.*,
377 F.3d 817 (8th Cir. 2004) ........................................................ 26

*PennEast Pipeline Company, LLC v. New Jersey*,
594 U.S. 482 (2021) ................................................................. 1

*Puntenney v. Iowa Utilities Bd.*,
928 N.W.2d 829 (Iowa 2019) ................................................. 6, 15, 26

*Schmitt v. War Emergency Pipelines*,
175 F.2d 335 (8th Cir. 1949) ........................................................ 2

*Texas Midstream Gas Services v. City of Grand Prairie*,
608 F.3d 200 (5th Cir. 2011) ........................................................ 24

*United States v. Eagleboy*,
200 F.3d 1137 (8th Cir. 1999) ........................................................ 5

Appellate Case: 23-3760     Page: 4     Date Filed: 07/08/2024 Entry ID: 5410865

*Village of Euclid v. Ambler Realty Co.*,
  272 U.S. 365 (1926) ...................................................... 18, 19

*Washington Gas Light Co. v. Prince George's County Council*,
  711 F.3d 412 (4th Cir. 2013) .................................... 24, 25

## Statutes

49 U.S.C. § 60101 .......................................................... 28

49 U.S.C. § 60102 .......................................................... 31

49 U.S.C. § 60103 .................................................. 26, 27, 28

49 U.S.C. § 60104 .............................. 25, 26, 27, 28, 29, 30, 31

49 U.S.C. § 60105 .......................................................... 10

49 U.S.C. § 60115 .......................................................... 11

H.R. Rep. No. 90-1390 (1968), *reprinted in* 1968
  U.S.C.C.A.N. 3,223, 3,251-3,253 ................................ 29, 30

Pub. L. No. 90-481 (1968) ............................................. 28

Pub. L. No. 96-129 (1979) ............................................. 28

Pub. L. No. 100-561 (1988) ........................................... 10

Pub. L. No. 102-508 (1992) ........................................... 10

Pub. L. No. 103-272 (1994) ........................................... 29

Pub. L. No. 104-304 (1996) ........................................... 10

Pub. L. No. 107-355 (2002) ...................................... 10, 11

Pub. L. No. 109-468 (2006) ........................................... 11

Pub. L. No. 112-90 (2012) ............................................. 11

Pub. L. No. 114-183 (2016) ........................................... 11

Pub. L. No. 116-260 (2020) ........................................... 11

## Regulations

37 Fed. Reg. 145 (Jan. 6, 1972) ................................... 28

49 C.F.R. § 192 ........................................................ 10, 26

49 C.F.R. § 192.7 .......................................................... 10

49 C.F.R. § 192.163 ...................................................... 30

49 C.F.R. § 192.179 ...................................................... 30

Appellate Case: 23-3760     Page: 5     Date Filed: 07/08/2024 Entry ID: 5410865

49 C.F.R. § 192.185 ..................................................... 31

49 C.F.R. § 192.325 ..................................................... 31

49 C.F.R. § 192.327 ..................................................... 31

49 C.F.R. § 192.353 ..................................................... 31

49 C.F.R. § 192.365 ..................................................... 31

49 C.F.R. § 193.2013 ................................................... 10

49 C.F.R. § 195 ............................................... 10, 26, 30

49 C.F.R. § 195.3 ........................................................ 10

49 C.F.R. § 195.210 ............................................... 25, 30

49 C.F.R. § 195.248 ..................................................... 30

49 C.F.R. § 195.250 ..................................................... 30

49 C.F.R. § 195.254 ..................................................... 30

49 C.F.R. § 195.260 ..................................................... 30

49 C.F.R. § 195.262 ..................................................... 30

49 C.F.R. § 195.402 ..................................................... 31

49 C.F.R. § 195.403 ..................................................... 31

49 C.F.R. § 198 .......................................................... 10

## Other Authorities

American Gas Association (2024), *available at* https://playbook.aga.org/ ..................................................... 9

American Petroleum Institute, *New API Standard Outlines Best Practices for Public Engagement in Pipeline Construction & Operations* (March 2024), *available at* https://www.api.org/news-policy-and-issues/news/2024/03/28/api-publishes-rp-1185-pipeline-community-engagement ............................................... 12

American Petroleum Institute and Liquid Energy Pipeline Association, *2023 Performance Report & 2023–2025 Pipeline Excellence Strategic Plan*, *available at* https://content.membernova.com/305561/Document/Download?DocumentType=AccountDocuments&DocumentId=fd58e243-914d-4ff2-8bf6-

Appellate Case: 23-3760     Page: 6     Date Filed: 07/08/2024 Entry ID: 5410865

d1478f7932d4&SelectedId=7465ad6d-9c2a-4b24-8e79-320b3588624f ............................................................................ 8

Brich, Renee, *Supervisors Give Comments Regarding Pipeline Ordinance Injunction*, Harlan Newspapers (July 24, 2023) *available at* https://www.harlanonline.com/news/supervisors-give-comments-regarding-pipeline-ordinance-injunction ........................ 20

Brich, Renee, *Supervisors Remind Pipeline Company And Landowners Zoning Ordinance Will Be Enforced*, Harlan Newspapers (February 9, 2023), *available at* https://harlannews.com/news/supervisors-remind-pipeline-company-and-landowners-zoning-ordinance-will-be-enforced ...................................................................... 20, 21

Craine, Nicole V. and W. Mark Craine, *The Cost of Federal Regulation to the U.S. Economy, Manufacturing and Small Business,* National Association of Manufacturers (Oct. 2023), *available at* https://nam.org/wp-content/uploads/2023/11/NAM-3731-Crains-Study-R3-V2-FIN.pdf ...................................................................... 22

Dakota Institute, *Economic Impacts of CO2 Pipelines in South Dakota* (2023), *available at* https://www.dakotainstitute.org/wp-content/uploads/2023/06/Dakota-Institue-Economic-Impacts-of-CO2-Pipelines-Final-Report.pdf ............................ 17

Decision Innovation Solutions, *Comparative Economics of Carbon Sequestration for Iowa Ethanol Plants* (2023), *available at* https://iowarfa.org/wp-content/uploads/2023/03/230227-FINAL-Combined-IRFA-Comparative-Economics-of-Carbon-Sequestration-for-Iowa-Ethanol-Plants_Phase-1-Phase-2.pdf .............................. 17, 18

Energy Infrastructure, *Investing in Pipelines: Benefitting the Economy and Creating Jobs* (2021), *available at* https://www.energyinfrastructure.org/pipeline/investing-in-pipelines ............................................................................ 9

Appellate Case: 23-3760    Page: 7    Date Filed: 07/08/2024 Entry ID: 5410865

Federal Reserve Bank of St. Louis, *Local Governments in the U.S.: A Breakdown by Number and Type* (March 14, 2024), *available at* https://www.stlouisfed.org/publications/regional-economist/2024/march/local-governments-us-number-type#:~:text=In%20the%20most%20recent%20Census,township%20and%20municipal%20governments%2C%2012%2C546 ........................................................................ 21

Kiefner, John F. and Cheryl J. Trench, *Oil Pipeline Characteristics and Risk Factors: Illustrations from the Decade of Construction* (Dec. 2001), *available at* https://www.api.org/~/media/files/oil-and-natural-gas/ppts/other-files/decadefinal.pdf?la=en ......................................... 6

Lavinsky, Corey, *Cancellation of Navigator CO2 Pipeline Raises Critical Issues for Several Industries* (Oct. 25, 2023), *available at* https://www.spglobal.com/commodityinsights/en/market-insights/blogs/energy-transition/102523-navigator-co2-carbon-capture-heartland-greenway-pipeline-cancellation ....... 22, 23

Pipeline and Hazardous Materials Safety Administration, *Pipeline Incident 20 Year Trends* (last updated Jul. 5, 2024), *available at* https://www.phmsa.dot.gov/data-and-statistics/pipeline/pipeline-incident-20-year-trends .................. 6, 7, 8

Pipeline and Hazardous Materials Safety Administration, *Pipeline Mileage and Facilities* (last updated Jul. 5, 2024), *available at* https://www.phmsa.dot.gov/data-and-statistics/pipeline/pipeline-mileage-and-facilities ........................... 13

Texas Department of Transportation, *Economic Impact of Pipelines in Texas*, *available at* https://ftp.dot.state.tx.us/pub/txdot/move-texas-freight/resources/economic-role-freight/economic-impact-piplines.pdf ............................................................................ 15

Texas Tech University, *Update to the Economic Impacts of the Texas Oil and Gas Pipeline Industry* (Sept. 2020), *available at* https://texaspipelines.com/wp-content/uploads/2020/10/Update-to-the-Economic-Impacts-

Appellate Case: 23-3760     Page: 8     Date Filed: 07/08/2024 Entry ID: 5410865

of-Texas-Oil-and-Gas-Pipeline-September-2020-
FINAL.pdf ....................................................................... 16

Transportation Research Board of the National Academies,
*Transmission Pipelines and Land Use: A Risk-Informed
Approach, Committee for Pipelines and Public Safety:
Scoping Study on the Feasibility of Developing Risk-
Informed Land Use Guidance near Existing and Future
Transmission Pipelines* (2004), *available at*
https://primis.phmsa.dot.gov/comm/publications/PIPA/SR2
81_Final_Published.pdf ....................................................... 6

U.S. Department of State, Bureau of Oceans and
International Environmental and Scientific Affairs, *Final
Supplemental Environmental Impact Statement for the
Keystone XL Project, 4.10-2* (last updated Jan. 2014),
*available at* https://2012-keystonepipeline-
xl.state.gov/finalseis/index.htm .................................... 14, 15

U.S. Department of Transportation, Bureau of
Transportation Statistics, *Transportation Statistics
Annual Report 2016* (2016), *available at*
https://www.rita.dot.gov/bts/sites/rita.dot.gov.bts/files/publ
ications/transportation_statistics_annual_report/index.ht
ml ...................................................................................... 5

U.S. Department of Transportation, Bureau of
Transportation Statistics, *Transportation Statistics
Annual Report 2023* (Dec. 1, 2023), *available at*
https://doi.org/10.21949/1529944 ................................ 5, 12, 13, 14

U.S. Energy Information Association, *Natural Gas
Consumption by End Use* (last updated Jun. 28, 2024),
*available at*
https://www.eia.gov/dnav/ng/ng_cons_sum_a_EPG0_vgt_m
mcf_a.htm ........................................................................ 13

Appellate Case: 23-3760     Page: 9     Date Filed: 07/08/2024 Entry ID: 5410865

# IDENTITY AND INTEREST OF AMICI CURIAE AND SOURCE OF FILING AUTHORITY

American Petroleum Institute ("API") represents all segments of America's natural gas and oil industry, which supports more than 11 million U.S. jobs and is backed by a growing grassroots movement of millions of Americans. Its nearly 600 members produce, process, and distribute the majority of the nation's energy, and participate in API Energy Excellence®, which is accelerating environmental and safety progress by fostering new technologies and transparent reporting. API believes that access to oil and natural gas resources is critical to supplying the energy needs of American consumers, businesses, and homeowners.

Liquid Energy Pipeline Association ("LEPA") is a national trade association that promotes responsible policies, safety excellence, and public support for liquids pipelines. LEPA represents pipelines transporting 97 percent of all hazardous liquids barrel miles reported to the Federal Energy Regulatory Commission ("FERC"). Its diverse membership includes large and small pipelines carrying crude oil, refined petroleum products, natural gas liquids, carbon dioxide ("$CO_2$"), and other liquids.

Appellate Case: 23-3760     Page: 10     Date Filed: 07/08/2024 Entry ID: 5410865

CO2 pipelines, like the one at issue in this litigation, are of critical importance to many of API's and LEPA's members, who are themselves investors, operators, and developers of CO2 pipelines. In addition to reducing emissions, carbon capture and storage generates many other benefits, including support of good-paying, union-friendly jobs and generation of private investment.

Pipelines create thousands of good-paying jobs all across America in construction, manufacturing, professional, and service industries. Each pipeline construction project creates thousands of jobs that can support a family. Those jobs require the support of many more jobs in manufacturing, transportation, finance, hospitality, and health care. The energy and raw materials that pipelines deliver create jobs across the economy in consumer products and retailing. API's and LEPA's members strongly support this economic development.

As such, API and LEPA believe they can provide this Court with knowledge and perspective that will aid the Court in rendering its decision.

All parties have consented to the filing of this brief in accordance with Federal Rule of Appellate Procedure 29(a)(2).

Appellate Case: 23-3760    Page: 11    Date Filed: 07/08/2024 Entry ID: 5410865

## RULE 29(a)(4)(E) STATEMENT

In compliance with Federal Rule of Appellate Procedure 29(a)(4)(E), the undersigned counsel certifies that no party's counsel authored this brief in whole or in part, and no party or party's counsel, or any person other than amici API and LEPA or its counsel, contributed money that was intended to fund the preparation of submission of this brief.

*/s/ Christina Manfredi McKinley*
Christina Manfredi McKinley

## INTRODUCTION

There are more than 3 million miles of pipelines in the U.S. carrying commodities that are vital to the lives of ordinary Americans. Pipelines transport the liquid fuels that keep more than 250 million cars and trucks running on our roadways. They deliver the feedstocks the petrochemical industry uses to manufacture plastics, detergents, synthetic fabrics, paints, and a variety of other consumer products. And they carry the natural gas that produces more than 40 percent of our electric power and which is rapidly becoming a more important source of power for our allies around the world. As particularly relevant here, pipelines also transport another important commodity—CO2—which experts say is the primary greenhouse gas contributing to global climate change.

Americans have been using pipelines to deliver energy products since the 19th century. *PennEast Pipeline Company, LLC v. New Jersey*, 594 U.S. 482, 488 (2021) (discussing history of natural gas industry); *Larson v. Sinclair Transp. Co.*, 2012 CO 36, ¶ 45-57, 284 P.3d 42, 50 (Co. 2012) (en banc) (Justice Hobbs, dissenting) (discussing history of oil industry). The nation's first oil pipelines began to appear in the 1860s as industry pioneers in Pennsylvania sought to replace wooden barrels and

horsedrawn wagons with a more efficient and cost-effective method of transportation. The success of these early efforts laid the foundation for the development of more sophisticated pipeline systems that could transport larger quantities of product to distant markets. But the basic rationales for using pipelines—efficiency and cost effectiveness—remain the same today.

Pipelines also are one of the safest forms of transportation. Indeed, the need to establish a safe and secure method for transporting energy products during World War II prompted the industry and federal government to join forces in building two of our most famous pipelines, the Big Inch and Little Big Inch. *Schmitt v. War Emergency Pipelines*, 175 F.2d 335 (8th Cir. 1949). These pipelines provided the fuel that allowed the Allied Powers to succeed on the battlefield and end the deadliest armed conflict in human history. Experience has further shown that pipelines can be used to safely carry energy products for decades through proper design, construction, testing, operation, and maintenance. The Big Inch and Little Big Inch remain in service today. And aside from playing a pivotal role in our energy and transportation security, an incidental—and substantial—benefit of pipelines is that they

are a boon to the nation's economy. Pipelines transport energy and other products that are the lifeblood of our entire economic system.

Against this backdrop, Congress has enacted a detailed statutory scheme authorizing the Pipeline and Hazardous Materials Safety Administration ("PHMSA") to administer a comprehensive federal pipeline safety program. Congress also included a preemption provision in that statute to ensure uniformity in the administration of this program. That provision, as this Court held in *ANR Pipeline Co. v. Iowa State Commerce Comm'n*, 828 F.2d 465 (8th Cir. 1987) and *Kinley Corp. v. Iowa Utilities Bd.*, 999 F.2d 354 (8th Cir. 1993), makes clear that the safety of interstate pipelines is the prerogative of one regulator, PHMSA, to the exclusion of all others.

Yet, occasionally, certain governmental authorities try to second-guess the decisions that Congress originally made in enacting the pipeline safety laws and that PHMSA continues to make in prescribing the federal pipeline safety standards. Rather than respecting the boundaries of this well-established area of federal law and policy, they sometimes express their well-meaning (but misplaced) concern for safety by attempting to regulate the pipelines that traverse their communities

Appellate Case: 23-3760     Page: 15     Date Filed: 07/08/2024 Entry ID: 5410865

through the adoption of "zoning ordinances" such as those at issue in these consolidated cases.

But even if called a zoning ordinance, there can be no doubt that the ordinances at issue here are, indeed, preempted pipeline safety standards. Although the counties have attempted to masquerade them as zoning regulations, the regulations' stated aims quickly unmask their true intent: to regulate—essentially, negatively zone out of existence—pipelines due to perceived inadequacies in PHMSA's regulations. And that aim is directly at odds with the facts on the ground, the economic and security interests of countless Americans, and the express intent of Congress, which has placed the safety of interstate pipelines firmly in the hands of PHMSA.

The district court in these consolidated cases unveiled the county ordinances for their true aims, and it correctly held that those ordinances were preempted by federal and Iowa law. This amici brief addresses several of the policies supporting federal preemption, and it explains the broader consequences to the federal scheme and the economy if the Defendants-Appellants' arguments were to prevail.

-4-

<u>ARGUMENT</u>

## I. PIPELINES ARE THE SAFEST MEANS OF TRANSPORTING ENERGY PRODUCTS.

### A. Pipelines are Getting Even Safer.

Pipelines are by far the safest means of transporting energy products. According to the Bureau of Transportation Statistics ("BTS"), pipelines caused fewer fatalities and injuries than other modes of transportation from 2016 to 2021.[1, 2] Only 69 pipeline-related fatalities and 303 pipeline-related injuries occurred during that six-year period, for example, as compared to more than 230,000 highway-related fatalities and nearly 16 million highway-related injuries.[3] These results are consistent with BTS's analysis of the available transportation safety data for the 2010 to 2015 period.[4] Only 78 pipeline-related fatalities and 395

---

[1] This Court can take judicial notice of public records, treatises, law review articles, etc., which may be cited for the first time on appeal. *United States v. Eagleboy*, 200 F.3d 1137, 1140 (8th Cir. 1999).

[2] U.S. Department of Transportation, Bureau of Transportation Statistics, *Transportation Statistics Annual Report 2023*, *available at* https://doi.org/10.21949/1529944.

[3] *Id.* at 5-4.

[4] U.S. Department of Transportation, Bureau of Transportation Statistics, *Transportation Statistics Annual Report 2016*, *available at* https://www.rita.dot.gov/bts/sites/rita.dot.gov.bts/files/publications/transportation_statistics_annual_report/index.html.

Appellate Case: 23-3760     Page: 17     Date Filed: 07/08/2024 Entry ID: 5410865

pipeline-related injuries occurred during that timeframe as compared to nearly 200,000 highway-related fatalities and nearly 14 million highway-related injuries.[5]

PHMSA's data also shows that pipelines are getting safer. The latest 3-, 5-, 10-, and 20-year rolling averages indicate that the number of serious pipeline incidents involving fatalities or injuries is in decline.[6]

---

[5] *Id.* at p. 144, 151. *See also Puntenney v. Iowa Utilities Bd.*, 928 N.W.2d 829, 841 (Iowa 2019) (affirming the finding of the Iowa Utilities Board "that on a volume-distance basis (*i.e.*, per barrel-mile), pipeline transportation of oil is safer than rail transportation of oil."). For an analysis of earlier pipeline incident data, *see* Appendix B of Special Report 281, Transportation Research Board of the National Academies, *Transmission Pipelines and Land Use: A Risk-Informed Approach, Committee for Pipelines and Public Safety: Scoping Study on the Feasibility of Developing Risk-Informed Land Use Guidance near Existing and Future Transmission Pipelines*, 79–88 (2004), *available at* https://primis.phmsa.dot.gov/comm/publications/PIPA/SR281_Final_Published.pdf (hereinafter, "Appendix B of Special Report"); *see also* John F. Kiefner and Cheryl J. Trench, *Oil Pipeline Characteristics and Risk Factors: Illustrations from the Decade of Construction* (Dec. 2001), *available at* https://www.api.org/~/media/files/oil-and-natural-gas/ppts/other-files/decadefinal.pdf?la=en.

[6] PHMSA, *Pipeline Incident 20 Year Trends, available at* https://www.phmsa.dot.gov/data-and-statistics/pipeline/pipeline-incident-20-year-trends (last updated Jul. 5, 2024) (click "SERIOUS INCIDENT 20 YEAR TREND" and review charts depicting "Incident Count," "Fatalities," and "Injuries"). For these purposes, PHMSA treats a "serious incident" as one that involves a fatality or injury requiring in-patient hospitalization, but which excludes what are known as fire first events. https://www.phmsa.dot.gov/data-and-statistics/pipeline/pipeline-

-6-

The average number of pipeline-related fatalities and injuries that occurred from 2014 through 2023 is 50 percent less than the average number of pipeline-related fatalities and injuries that occurred from 1989 through 1998.[7]  PHMSA's serious incident data for hazardous liquid pipelines paints an even more favorable picture.[8]  Hazardous liquid pipelines only experienced two serious incidents per year on average from 2004–2023, and have only experienced a single serious incident per year on average since 2014.[9]  PHMSA's serious incident data for $CO_2$ pipelines is equally compelling.  Only one serious incident involving a $CO_2$ pipeline

---

incident-20-year-trends.

[7] *Compare* PHMSA, *Pipeline Incident 20 Year Trends*, *available at* https://www.phmsa.dot.gov/data-and-statistics/pipeline/pipeline-incident-20-year-trends (click "SERIOUS INCIDENT 20 YEAR TREND" and review chart depicting "Incident Count" labeled "10 Year Average – (2014-2023)"), *with* Appendix B of Special Report 281, p. 80.

[8] PHMSA, *Pipeline Incident 20 Year Trends*, *available at* https://www.phmsa.dot.gov/data-and-statistics/pipeline/pipeline-incident-20-year-trends (click "SERIOUS INCIDENT 20 YEAR TREND," select "Hazardous Liquid" from the dropdown menu for "System Type").

[9] *Id.* (review charts depicting "Incident Count" labeled "20 Year Average—(2004–2023)" and "10 Year Average—(2014–2023)").  Only six injuries occurred due to serious hazardous liquid pipeline incidents in 2021, 2022, or 2023 with no fatalities.

Appellate Case: 23-3760      Page: 19      Date Filed: 07/08/2024 Entry ID: 5410865

occurred from 2004–2023, resulting in a single injury in 2007 and no fatalities.[10]

The latest industry data for hazardous liquid pipelines confirms the positive trends in the BTS and PHMSA data.[11] According to a May 2024 report prepared by the amici, the number of liquid pipeline incidents with impacts on people or the environment decreased 7 percent from 2019 to 2023. Total liquid pipeline incidents also decreased by 23 percent during that same period, with 87 fewer incidents occurring in 2023 as compared to 2019. Liquids pipeline incidents occurring in high consequence areas, which are subject to PHMSA's integrity management program requirements, declined by 35 percent during the 2019 to 2023 period as

---

[10] PHMSA, *Pipeline Incident 20 Year Trends*, *available at* https://www.phmsa.dot.gov/data-and-statistics/pipeline/pipeline-incident-20-year-trends (click "SERIOUS INCIDENT 20 YEAR TREND", select "Hazardous Liquid" from the dropdown menu for "System Type", select "CO2" from the dropdown menu for "Commodity", and review chart depicting serious incidents).

[11] API and LEPA, *2023 Performance Report & 2023–2025 Pipeline Excellence Strategic Plan*, *available at* https://content.membernova.com/305561/Document/Download?DocumentType=AccountDocuments&DocumentId=fd58e243-914d-4ff2-8bf6-d1478f7932d4&SelectedId=7465ad6d-9c2a-4b24-8e79-320b3588624f.

Appellate Case: 23-3760     Page: 20     Date Filed: 07/08/2024 Entry ID: 5410865

well.  In sum, the industry data shows that pipelines safely deliver a barrel of energy to their destination 99.999% of the time.

### B.  Pipelines Have a Strong Safety Record Because of the Cooperative Efforts of Industry, Regulators, and the Public.

Pipelines have a strong safety record for several reasons.  First, the industry is committed to eliminating all pipeline incidents and invests billions of dollars each year toward achieving that objective.[12]  These investments fund critical operations, maintenance, and integrity management activities; public awareness, education, and community outreach programs; targeted pipeline repair, replacement, and rehabilitation efforts; and research and development initiatives, including improvements in pipeline materials, inspection tools, and other technologies.  The industry also leads or participates in the various standards development organizations ("SDOs") that produce many of the technical codes, standards, and recommended practices that apply to the pipeline industry.[13]

---

[12] Energy Infrastructure, *Investing in Pipelines: Benefitting the Economy and Creating Jobs* (2021), https://www.energyinfrastructure.org/pipeline/investing-in-pipelines; *see also* American Gas Association (2024), https://playbook.aga.org/.

[13] API is one of the world's leading SDOs for the oil and gas industry,

Appellate Case: 23-3760     Page: 21     Date Filed: 07/08/2024 Entry ID: 5410865

Second, PHMSA administers a robust and comprehensive nationwide pipeline safety program pursuant to the authority in the Pipeline Safety Act. PHMSA has prescribed federal safety standards that apply throughout the lifecycle of a pipeline project, including requirements for materials, design, construction, testing, operations, maintenance, personnel qualification, and integrity management. *See* 49 C.F.R. Parts 192, 195. PHMSA also oversees a federal certification and grant program that allows state authorities to assume responsibility for regulating the safety of intrastate pipeline facilities, including by establishing additional or more stringent safety standards that are compatible with PHMSA's regulations. 49 U.S.C. §§ 60105–107; 49 C.F.R. Part 198.[14]

---

having produced more than 800 standards in the past 100 years, including dozens of standards that are followed by pipeline operators throughout the United States. https://www.api.org/products-and-services/standards. PHMSA incorporates numerous API standards into the federal pipeline safety regulations. *See* 49 C.F.R. §§ 192.7(b), 193.2013(c), 195.3(b).

[14] Congress routinely addresses emerging pipeline safety issues in reauthorizing the Pipeline Safety Act. *See e.g.*, Pipeline Safety Reauthorization Act of 1988, Pub. L. 100-561, 102 Stat. 2805; Pipeline Safety Act of 1992, Pub. L. No. 102-508, 106 Stat. 3289; Accountable Pipeline Safety and Partnership Act of 1996, Pub. L. No. 104-304, 110 Stat. 3794; Pipeline Safety Improvement Act of 2022, Pub. L. No. 107-

-10-

Last, but not least, the public plays a critical role in ensuring the safety of our nation's pipelines. The public is an active participant in the development of the various codes and standards that SDOs issue for the pipeline industry and in the rulemaking process that leads to the promulgation of new regulations by PHMSA and its state partners.[15] Greater public awareness and involvement in the pipeline industry has also led to a significant reduction in the instances of third-party damage, once a leading cause of pipeline incidents.[16] The public was a driving force behind the creation of an entirely new API Recommended Practice

---

355, 116 Stat. 2985; Pipeline Inspection, Protection, Enforcement, and Safety Act of 2006, Pub. L. No. 109-468, 120 Stat. 3490; Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011, Pub. L. 112-90 (2012), 125 Stat. 1904; Protecting our Infrastructure of Pipelines and Enhancing Safety Act of 2016, Pub. L. No. 114-183, 130 Stat. 514; Protecting Our Infrastructure of Pipelines and Enhancing Safety Act of 2020, Consolidated Appropriations Act, 2021, Division R, Pub. L. 116-260 (2020), 134 Stat. 2210. Congress is currently considering legislation to reauthorize the pipeline safety program again this year. *See* H.R. 6494, the Promoting Innovation in Pipeline Efficiency and Safety (PIPES) Act of 2023 https://transportation.house.gov/pipes-act-of-2023/.

[15] In addition to submitting comments, the public is afforded equal representation with the industry and government officials in determining the membership of the federal advisory committees that review PHMSA's rulemaking proposals under the Pipeline Safety Act, 49 U.S.C. § 60115.

[16] AMERICAN GAS ASS'N, NATURAL GAS PIPELINE SAFETY AND RELIABILITY: AN ASSESSMENT OF PROGRESS 20–25 (2013).

to further improve pipeline safety with enhanced stakeholder outreach and engagement.[17]  In short, the efforts of industry, regulators, and the public are what make pipelines one of the safest forms of transportation.

## II.   PIPELINES ARE A CRITICAL COMPONENT OF THE UNITED STATES ECONOMY.

The nation's transportation network plays a vital role in the overall health and stability of the U.S. economy.[18]  According to BTS, the U.S. transportation sector served 333 million people living in 124 million households in 2022.[19]  The transportation sector also accounted for approximately 9 percent of U.S. gross domestic product ("GDP") in 2022, making an important direct and indirect contribution to the nation's economy.[20]

---

[17] API, *New API Standard Outlines Best Practices for Public Engagement in Pipeline Construction & Operations* (March 2024), *available at* https://www.api.org/news-policy-and-issues/news/2024/03/28/api-publishes-rp-1185-pipeline-community-engagement.

[18] U.S. Department of Transportation, *Transportation Statistics Annual Report 2023*, Bureau of Transportation Statistics, *available at* https://rosap.ntl.bts.gov/view/dot/72943.

[19] *Id.* at 1-1.

[20] *Id.* at 4-2.

-12-

Pipelines are an integral part of the U.S. transportation network. There are more than 3.2 million miles of pipelines in the U.S.[21] Pipelines transport nearly all of the natural gas, and most of the crude oil and refined petroleum products, that millions of Americans use each day. In 2021, for example, pipelines delivered about 27.6 trillion cubic feet of natural gas to U.S. consumers[22] and carried approximately 3.4 billion barrels of crude oil, refined petroleum products, and other hazardous liquids.[23]

Pipelines are particularly important to ensuring an adequate supply of liquid fuels. The transportation sector accounted for approximately 27 percent of U.S. primary energy consumption in 2022, second only to electricity generation in terms of domestic use and more than the total energy consumption of every other country in the world

---

[21] PHMSA, *Pipeline Mileage and Facilities*, *available at* https://www.phmsa.dot.gov/data-and-statistics/pipeline/pipeline-mileage-and-facilities (follow "2010+ Pipeline Miles and Facilities") (last updated Jul. 5, 2024).

[22] U.S. Energy Information Association, *Natural Gas Consumption by End Use* (last updated Jun. 28, 2024), *available at* https://www.eia.gov/dnav/ng/ng_cons_sum_a_EPG0_vgt_mmcf_a.htm.

[23] U.S. Department of Transportation, *Transportation Statistics Annual Report 2023*, Bureau of Transportation Statistics, 1-37, *available at* https://rosap.ntl.bts.gov/view/dot/72943.

except for China and India.[24]   Petroleum, which is the source of approximately 90 percent of the energy used by the transportation sector,[25] would not be as widely available, or transported as safely and efficiently, without the bulk shipments that occur each day via the nation's pipelines.

It is therefore unsurprising that pipelines have a tremendous impact on the U.S. economy as well.  In analyzing the Keystone XL Project, for example, the U.S. Department of State ("State Department") estimated that completing the proposed 875-mile oil pipeline would contribute $3.4 billion to U.S. GDP, including $3.1 billion in domestic construction contracts, materials and support purchased and another $233 million spent on construction camps.[26]   The State Department further estimated that construction spending alone would support approximately 42,100 annual jobs and generate approximately $2.05

---

[24] *Id.* at 6-2.

[25] *Id.* at 6-5.

[26] United States Department of State, Bureau of Oceans and International Environmental and Scientific Affairs, Final Supplemental Environmental Impact Statement for the Keystone XL Project, 4.10-2 (Jan. 2014), available at https://2012-keystonepipeline-xl.state.gov/finalseis/index.htm.  (last accessed Jul. 5, 2024)

-14-

billion in earnings.[27]  The Iowa Utilities Board ("IUB") reached similar conclusions in analyzing the economic benefits of the Dakota Access oil pipeline in a more recent proceeding.[28]

Data maintained by Texas, the nation's top oil and gas producing state, further demonstrates the positive economic impact of pipelines. According to the Texas Department of Transportation, pipeline transportation has an annual direct, indirect, and induced impact in Texas that "supports 155,631 jobs, $25.5 billion in labor income, $21.8 billion in Gross State Product, and $2.2 billion in state and local tax revenues."[29]  Pipeline transportation also has direct annual effects on pipeline-dependent industries that support 393,200 jobs, $44.9 billion in income, and $158.6 billion in Gross State Product.  And a study prepared

---

[27] *Id.*

[28] *Puntenney*, 928 N.W.2d at 841 (agreeing with IUB in concluding that the "record indicates that the Dakota Access pipeline will lead to 'longer-term, reduced prices on refined products and goods and service dependent on crude oil and refined products'); *id.* at 842 (noting that "the IUB observed that the pipeline would result in at least 3100 construction jobs in Iowa, at least twelve long-term jobs for Iowans, and more than $ 27 million annually in property tax revenue").

[29] Texas Department of Transportation, *Economic Impact of Pipelines in Texas*, *available at* https://ftp.dot.state.tx.us/pub/txdot/move-texas-freight/resources/economic-role-freight/economic-impact-piplines.pdf.

Appellate Case: 23-3760    Page: 27    Date Filed: 07/08/2024 Entry ID: 5410865

by Texas Tech University shows that these positive economic impacts are long lasting.[30]  As the authors of that study explain, "the Texas pipeline industry is conservatively expected to generate cumulative economic impacts (in today's dollars) of $1.49 trillion in economic output, $903 billion in additional gross state product, and contribute $84 billion in state and local government revenues" over the 40-year period from 2020 to 2060.[31]

CO2 pipelines will produce similar economic benefits.  The Dakota Institute, a nonprofit economic research and analysis organization that supports the long-term economic growth and development of South Dakota and the northern plains region, examined the economic benefits to the South Dakota economy of constructing and operating the Navigator and Summit pipelines in 2023.  The Dakota Institute concluded that the construction of those two pipelines alone would have a total economic impact on state GDP to the tune of $3.3 billion.  It also

---

[30] Texas Tech University, *Update to the Economic Impacts of the Texas Oil and Gas Pipeline Industry* (Sept. 2020), *available at* https://texaspipelines.com/wp-content/uploads/2020/10/Update-to-the-Economic-Impacts-of-Texas-Oil-and-Gas-Pipeline-September-2020-FINAL.pdf.

[31] *Id.* at 4.

Appellate Case: 23-3760     Page: 28     Date Filed: 07/08/2024 Entry ID: 5410865

looked at state gross output, a broader measure of economic activity than GDP, and concluded that the pipelines would contribute $5.92 billion to South Dakota's economy: $1.68 billion from construction, $1.6 billion from clean fuel and carbon capture and storage tax credits, $1.36 billion from a stronger corn basis, and $1.28 billion from the operating activities of the pipelines. So, too, the Dakota Institute determined that the impact on job creation in the state would be significant; the construction of the pipelines was predicted to support 7,105 jobs from 2024–2034.[32]

A 2023 study prepared for the Iowa Renewable Fuels Association related to carbon sequestration reaches the same conclusions. That 60-page study, conducted by Decision Innovation Solutions, analyzes the economic impact to the state from construction of a CO2 pipeline system. It determined that construction would have a positive economic impact to the state of $2.16 billion related to tax credits. It further observed the corresponding negative effect of $10.3 billion on Iowa if the pipeline

---

[32] Dakota Institute, *Economic Impacts of $CO_2$ Pipelines in South Dakota*, at 8 (2023), *available at* https://www.dakotainstitute.org/wp-content/uploads/2023/06/Dakota-Institue-Economic-Impacts-of-CO2-Pipelines-Final-Report.pdf.

Appellate Case: 23-3760    Page: 29    Date Filed: 07/08/2024 Entry ID: 5410865

system were not constructed in Iowa, but instead, that economic activity and its markets went to competing states.[33]

The positive economic benefit of pipelines simply cannot be understated. They not only are critical to the nation's energy policy and national security, but to its economic growth and development.

## III. ALLOWING THE COUNTY ORDINANCES TO STAND WOULD HAVE FAR-REACHING RAMIFICATIONS AND UNINTENDED CONSEQUENCES.

Amici believe the Plaintiffs-Appellees set forth the correct legal framework and analysis of the federal preemption issues. This brief does not attempt to rehash the arguments they make; it does, however, offer some additional arguments in support of that position.

### A. The County Setback Requirements are Preempted Pipeline Safety Standards, Not Permissible Land Use Regulations.

As an initial matter, amici recognize that counties and local municipalities have important roles in land-use decisions and public safety. *See, e.g.*, *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365,

---

[33] Decision Innovation Solutions, *Comparative Economics of Carbon Sequestration for Iowa Ethanol Plants* (2023), *available at* https://iowarfa.org/wp-content/uploads/2023/03/230227-FINAL-Combined-IRFA-Comparative-Economics-of-Carbon-Sequestration-for-Iowa-Ethanol-Plants_Phase-1-Phase-2.pdf.

-18-

394 (1926). For example, a county might decide that it does not want to allow a marijuana shop to operate next to a middle school. Or it might decide that it wants its residential districts to be separate from its commercial districts. But the primary purpose of the ordinances at issue here is to regulate the safety—or, conversely, the perceived danger—of pipelines.

That point becomes obvious when one looks at what the counties are *not* regulating. The pipeline at issue in these cases is not aboveground—it is buried (aside from, *e.g.*, appurtenances) (App. 1116, Story R. Doc. 30-3 (Declaration of James Pirolli)), which necessarily means any regulation cannot be aimed at aesthetic concerns.[34] Nor are the counties regulating other underground utilities in similar fashion; indeed, there is no indication that the counties are attempting to impose similar requirements on underground fiberoptic or electric or water lines. As for any concerns related to economic growth vis-à-vis property

---

[34] "Story R. Doc." refers to the docket in *Couser v. Story County*, Case No. 4:22-cv-00383. "Shelby R. Doc." refers to *Couser v. Shelby County*, Case No. 1:22-cv-00020.

Appellate Case: 23-3760     Page: 31     Date Filed: 07/08/2024 Entry ID: 5410865

values,[35] the burial of the pipeline eliminates any aesthetic effect on the use of the property.[36]   To the extent the concern for property values is based on fears of possible pipeline incidents, those are inherently safety concerns.  In short, each of these justifications is ill-fitting to the facts of these cases.  They serve only to belie the true intention of the ordinances, which is to regulate—essentially bar—construction of a pipeline the counties believe is unsafe.[37]

---

[35] *E.g.*, Renee Brich, *Supervisors Give Comments Regarding Pipeline Ordinance Injunction*, HARLAN NEWSPAPERS (July 24, 2023) ("Our goals were then, and still, are protecting future economic development growth, especially housing development within the county, along with protecting and growing our tax base." (quoting Shelby County Board of Supervisor Chairman Steve Kenkel)), *available at*

https://www.harlanonline.com/news/supervisors-give-comments-regarding-pipeline-ordinance-injunction.

[36] *E.g.*, App. 201, Shelby R. Doc. 47-2, p. 11 ("On a long-term basis, once the pipeline is buried and land restoration occurs, normal operation of the Project will create minimal inconvenience.  In most locations (other than above-ground appurtenances) farming—the current use of over 90% of the acres included in the route—can be conducted over top of the pipeline.").

[37] *E.g.*, Renee Brich, *Supervisors Remind Pipeline Company And Landowners Zoning Ordinance Will Be Enforced*, HARLAN NEWSPAPERS (February 9, 2023) ("Kenkel read the role of a supervisor from the Supervisor Handbook, which states 'The County Supervisor's duty is to protect and preserve the rights, the privileges, the property of the County and or it's [sic] residents and to preserve and improve the peace, the safety, the health, the welfare, the comfort, and convenience of it's [sic] residents.' 'Our Board takes that really seriously,' Kenkel said. 'We

Appellate Case: 23-3760     Page: 32     Date Filed: 07/08/2024 Entry ID: 5410865

But PHMSA, and PHMSA alone, regulates the safety of interstate pipelines. Allowing counties and local municipalities to regulate the safety of interstate pipelines under the guise of zoning would have negative and far-reaching effects that cannot be understated. According to the most recent Census of Governments, there are *90,837* local governments in the U.S., including 3,031 county governments, 35,705 township and municipal governments, 12,546 independent school districts, and 39,555 other special-purpose local governments.[38] Common sense dictates that if each of these 90,837 governmental authorities were permitted to issue regulations of the sort at issue in these cases, the nation's energy and transportation policy would be crippled simply by virtue of competing or conflicting regulations between each other, to say

_____

can't do our job if we don't have the proper information and we are doing our due diligence asking for it. It's a hazardous pipeline. It wouldn't be called hazardous if it wasn't hazardous. So we are asking you to be transparent and get us that information so we know what we are dealing with.'"), *available at* https://harlannews.com/news/supervisors-remind-pipeline-company-and-landowners-zoning-ordinance-will-be-enforced.

[38] Federal Reserve Bank of St. Louis, *Local Governments in the U.S.: A Breakdown by Number and Type* (March 14, 2024), *available at* https://www.stlouisfed.org/publications/regional-economist/2024/march/local-governments-us-number-type#:~:text=In%20the%20most%20recent%20Census,township%20and%20municipal%20governments%2C%2012%2C546.

Appellate Case: 23-3760    Page: 33    Date Filed: 07/08/2024 Entry ID: 5410865

nothing of regulations that could directly conflict with federal legislation and PHMSA's exclusive jurisdiction to address interstate pipeline safety.

Aside from the practical administrative hurdles of compliance, the economic effect of such regulations would be significant. Tracking and complying with the requirements of more than 90,000 (or even something less, such as 3,031 county governments or 35,705 township and municipal governments) would impose exorbitant, and often prohibitive, costs on industry participants.[39] Such regulations would negatively affect the economy by eliminating all of the jobs and related benefits that come from pipeline projects.

And, perhaps most troubling, onerous local government setback requirements have the potential to make needed pipeline development impossible.[40] These ordinances place significant roadblocks on the

---

[39] *See, e.g.*, Nicole V. Craine and W. Mark Craine, *The Cost of Federal Regulation to the U.S. Economy, Manufacturing and Small Business*, National Association of Manufacturers (Oct. 2023), *available at* https://nam.org/wp-content/uploads/2023/11/NAM-3731-Crains-Study-R3-V2-FIN.pdf (noting that compliance with federal regulations alone is estimated to be more than $3 trillion per year, which exceeds the entire annual economic output of the manufacturing sector).

[40] *See* Corey Lavinsky, *Cancellation of Navigator CO2 Pipeline Raises Critical Issues for Several Industries* (Oct. 25, 2023), *available at* https://www.spglobal.com/commodityinsights/en/market-

Appellate Case: 23-3760     Page: 34     Date Filed: 07/08/2024 Entry ID: 5410865

development of energy infrastructure that benefits all Americans. The corresponding ability of industry to meet energy and decarbonization demands would be substantially undermined and their development costs would be substantially increased. That consequence, in turn, could upset the efficient transportation of critical energy products to the American people.

The safety of interstate pipelines is exclusively the province of PHMSA. It must remain so and should not be undermined by poorly disguised local pipeline safety ordinances. *Cf., e.g.*, Amicus Brief of United States, *Enbridge Energy Co., Inc. et al. v. Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation*, Nos. 23-2309 and 23-2467, ECF No. 94 (7th Cir. 20204), at 47–48 ("The comprehensive nature of the [Pipeline Safety Act] vests authority in DOT to establish standards to address environmental risks and damage caused by pipeline operators, and it creates enforcement mechanisms to mitigate the risks and harms they cause.... A court's consideration of [public nuisance] claims asserted outside the statutory framework would

---

insights/blogs/energy-transition/102523-navigator-co2-carbon-capture-heartland-greenway-pipeline-cancellation.

Appellate Case: 23-3760    Page: 35    Date Filed: 07/08/2024 Entry ID: 5410865

invite the adoption of different standards by different courts, even for the same pipeline, and would undermine Congress's purpose to establish uniform regulation and enforcement of safety and environmental matters related to pipelines.").

Indeed, the ordinances at issue in this case are entirely unlike the siting ordinances other appeals courts have upheld as valid zoning ordinances even when they had incidental effects on safety. In *Texas Midstream Gas Services v. City of Grand Prairie*, for example, the Fifth Circuit held that a local regulation imposing a 300-foot setback requirement for a natural gas compressor station was a proper exercise of the City's zoning powers related to aesthetics. The purpose of the setback requirement was to ensure that "bulky, unsightly, noisy compressor stations do not mar neighborhood aesthetics." 608 F.3d 200, 211 (5th Cir. 2011). Of course, the proposed pipeline at issue in these cases will be below ground, and similar aesthetic concerns simply do not exist.

In *Washington Gas Light Co. v. Prince George's County Council*, a county zoning regulation prohibited the siting of a liquid natural gas facility and other proposed industrial uses at a given location. The

-24-

Fourth Circuit allowed the zoning ordinance over a preemption challenge because it was designed to promote transit-oriented development around a nearby subway station. 711 F.3d 412, 420–422 (4th Cir. 2013). That was a proper exercise of the county zoning authority entirely dissimilar to the ordinances at issue in these cases. When stripped of their veneer and factually implausible justifications, the ordinances at issue here are not a valid exercise of municipal zoning authority, but poorly disguised safety regulations. They are thus preempted under the Pipeline Safety Act.

### B. The Prohibition on Actual Location or Routing Decisions Does Not Save the Preempted County Ordinances.

Pointing to 49 U.S.C. § 60104(e), the counties argue that PHMSA has no authority to prescribe safety standards that affect the location or routing of pipeline facilities, including 49 C.F.R. § 195.210. The counties' broad reading of Section 60104(e) is fundamentally flawed and, if adopted, would have a dramatic impact on PHMSA's ability to establish uniform federal pipeline safety standards.

The ordinary tools of statutory interpretation make clear that Section 60104(e) only prohibits PHMSA from determining the specific

-25-

location or route where the pipeline will be placed. PHMSA has never made such decisions—owners and operators generally select the location or route for a pipeline facility and obtain the legal interest necessary to use the affected property, subject in some cases to review and approval by other governmental authorities. In Iowa, those governmental authorities include FERC for interstate gas transmission lines, *Northern Nat. Gas Co. v. Iowa Utilities Bd.*, 377 F.3d 817, 818 (8th Cir. 2004), and the IUB for intrastate gas pipeline facilities, *see e.g.*, *In re Homeland Energy Sols. LLC*, No. P-0907, 2023 WL 5512020 (Aug. 24, 2023), and hazardous liquid pipeline facilities, *Puntenney*, 928 N.W.2d at 852–853.

But Section 60104(e) does not, as the counties insist, prohibit PHMSA from prescribing any safety standards that affect the location or routing of pipeline facilities. PHMSA's express authorization under 49 U.S.C. § 60103(a) to establish standards for determining the location of new liquefied natural gas ("LNG") facilities directly contradicts that assertion. PHMSA also has promulgated numerous regulations in 49 C.F.R. Parts 192 and 195 that affect the location or routing of pipeline facilities. The counties' view would make each of these regulations

Appellate Case: 23-3760     Page: 38     Date Filed: 07/08/2024 Entry ID: 5410865

unlawful. There is no indication that Congress intended that result in enacting Section 60104(e).

Starting with the text of Section 60104(e), as the U.S. Court of Appeals for the District of Columbia Circuit recently held in interpreting another provision in the Pipeline Safety Act, the term "prescribe" means to "establish authoritatively." *GPA Midstream v. DOT*, 67 F.4th 1188, 1195 (D.C. Cir. 2023). The rest of Section 60104(e) speaks in specific terms in articulating what the Secretary cannot establish authoritatively; namely, "*the* location or routing of *a pipeline facility*." *Corner Post, Inc. v. Board of Governors, Federal Reserve System*, 603 U.S. ____ (2024), Slip Op. at 14–15 (addressing the use of "the" as definite article in conducting statutory analysis). In other words, the plain text indicates that Section 60104(e) only prohibits the Secretary from deciding on the actual location or routing of a particular pipeline facility.

Other provisions in the Pipeline Safety Act support that conclusion, most notably PHMSA's authority under Section 60103(a) to "prescribe minimum safety standards for deciding on the location of a new liquefied natural gas pipeline facility." 49 U.S.C. 60103(a). LNG facilities are "pipeline facilities" under the Pipeline Safety Act, 49 U.S.C.

§ 60101(a)(2), (3), (11), (14), (18); Liquid Natural Gas Safety Standards, Proposed Rule, 37 Fed. Reg. 145 (Jan. 6, 1972), and as such, are subject to the location or routing restriction in Section 60104(e). If the counties' broad reading of Section 60104(e) is correct, PHMSA is both authorized and prohibited from doing the same thing in two different statutory provisions. Congress certainly did not intend that absurd result, which is easily avoided if Section 60103(a) and Section 60104(e) are read in the proper context, *i.e.*, the former authorizes PHMSA to prescribe generally applicable location standards for LNG facilities, while the latter prohibits PHMSA from making decisions about where particular LNG facilities should be located.

The statutory history supports this reading as well. Contrary to the counties' assertions, Congress originally included the location or routing restriction in defining the term "pipeline facility" in the Natural Gas Pipeline Safety Act of 1968, Pub. L. 90-481, § 2(4), and Hazardous Liquid Pipeline Safety Act of 1979, Pub. L. 96-129, § 202(4). Both definitions noted that the use of the term "rights-of-way" in the Pipeline Safety Act did "not authorize the Secretary to prescribe the location or the routing of any pipeline facility." *Id.* In the 1994 recodification of Title

Appellate Case: 23-3760     Page: 40     Date Filed: 07/08/2024 Entry ID: 5410865

49 of the U.S. Code, Congress simply moved that language to another provision, Section 60104(e), without making any substantive changes. Pub. L. No. 103-272, 108 Stat. 745, preamble. Rather than evincing an intent to impose a broad prohibition, the original placement of that language in the definition of pipeline facility—and its association with the use of the term "rights-of-way"—confirms that Congress wanted to impose a much narrower location or routing restriction.[41]

The legislative history supports this analysis, too. The House Report for the 1968 Act includes an extensive discussion of the Federal Power Commission's ("FPC") authority to determine the location or routing of interstate gas pipeline facilities under the Natural Gas Act of 1938, H.R. Rep. No. 90-1390 (1968), reprinted in 1968 U.S.C.C.A.N. 3,223, 3,251-3,253, as well as a letter from the then-Chairman of the FPC describing the extent of "its jurisdiction and responsibility over the routing of natural gas pipelines." *Id.* at 3,252. The House Report further states that the addition of the location or routing provision to the

---

[41] The statutory history directly refutes the counties' argument that Congress did not limit the Secretary's authority over location or routing until the addition of Section 60104(e) in the 1994 recodification.

-29-

definition of pipeline facility in the 1968 Act was to preserve the FPC's role in making those decisions under the NGA. *Id.* at 3,251. The legislative history confirms that Congress had a specific concern in mind—*i.e.*, protecting the authority of another federal agency—rather a broad desire to preclude the Secretary from prescribing any safety standards that could affect the location or routing of pipeline facilities.

Finally, the counties' sweeping reading of Section 60104(e) would invalidate numerous PHMSA regulations. Section 195.210 is but one of the generally applicable safety standards in 49 C.F.R. Part 195 that affect the location or routing of hazardous liquid pipeline facilities. Other such standards include the depth-of-cover requirements in 49 C.F.R. § 195.248, the clearance requirements in 49 C.F.R. § 195.250, the requirements for above-ground components in § 49 C.F.R. § 195.254, the requirements for the location of valves in 49 C.F.R. § 195.260, and the requirements for the installation of pumping equipment in 49 C.F.R. § 195.262. Part 192 includes similar requirements for gas pipeline facilities. *See e.g.*, 49 C.F.R. §§ 192.163(a) (location of compressor buildings), 192.179(a) (spacing requirements for the location of valves), 192.185 (location requirements for vaults), 192.325 (underground

-30-

clearance requirements), 192.327 (depth-of-cover requirements), 192.353 (location requirements for customer meters), 192.365 (location of valves on service lines). Each of these safety standards would be unlawful under the counties' interpretation of Section 60104(e).

### C. The Counties' Emergency Response Requirements are Also Preempted Safety Standards.

The emergency response requirements in the counties' ordinances also are preempted safety standards. Section 60102(d)(5) makes clear that PHMSA is responsible for deciding whether operators of interstate pipeline facilities must share emergency response information with state officials. 49 U.S.C. § 60102(d)(5). PHMSA has also prescribed comprehensive emergency response requirements for hazardous liquid pipeline facilities in 49 C.F.R. §§ 195.402(e) and 195.403, including information sharing provisions. The counties have no authority to enact ordinances that intrude upon this exclusive area of federal regulation.

## CONCLUSION

PHMSA, and PHMSA alone, has the authority to regulate the safety of interstate pipelines. The counties' broad-based ordinances threaten to topple this balance, and with it, not just PHMSA's nationwide system of pipeline safety standards, but also, millions of miles of pipeline

-31-

systems that transport the nation's energy commodities and support the nation's economy. This observation is not hyperbolic. Far from it. It is grounded in the practical realities of federalism and the effects if local municipalities are permitted to regulate in an exclusively federal sphere by masking their regulations in the shroud of local zoning powers. The Court should not countenance the counties' vaguely cloaked attempts to legislate beyond the scope of their authority, however disguised.

Respectfully submitted,

*/s/ Christina Manfredi McKinley*
Keith J. Coyle, Esquire
Christina Manfredi McKinley, Esquire
Babst, Calland, Clements & Zomnir, P.C.
505 9th Street, NW, Suite 602
Washington, DC 20004
(202) 853-3460
kcoyle@babstcalland.com
cmckinley@babstcalland.com
*Counsel for Amici Curiae American*
*Petroleum Institute and Liquid*
*Energy Pipeline Association*

Dated: July 8, 2024

-32-

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 6,477 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced serif typeface using Microsoft Word in 14-point Century.

*/s/ Christina Manfredi McKinley*
Keith J. Coyle, Esquire
Christina Manfredi McKinley, Esquire
Babst, Calland, Clements & Zomnir, P.C.
505 9th Street, NW, Suite 602
Washington, DC 20004
(202) 853-3460
kcoyle@babstcalland.com
cmckinley@babstcalland.com
*Counsel for Amici Curiae American Petroleum Institute and Liquid Energy Pipeline Association*

Dated: July 8, 2024

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Amici Curiae Brief of American Petroleum Institute and Liquid Energy Pipeline Association was electronically filed through this Court's CM/ECF system, which will send a notice of filing to the counsel registered to receive service through the Court's CM/ECF system via electronic filing.

*/s/ Christina Manfredi McKinley*
Keith J. Coyle, Esquire
Christina Manfredi McKinley, Esquire
Babst, Calland, Clements & Zomnir, P.C.
505 9th Street, NW, Suite 602
Washington, DC 20004
(202) 853-3460
kcoyle@babstcalland.com
cmckinley@babstcalland.com
*Counsel for Amici Curiae American*
*Petroleum Institute and Liquid*
*Energy Pipeline Association*

Dated: July 8, 2024